[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 29, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15079

_____

D. C. Docket No. 05-22721-CV-KMM

INSTITUTO DE PREVISION MILITAR,

Plaintiff-Appellant,

versus

MERRILL LYNCH,
EDUARDO COLOMA,
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 29, 2008)**

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,[*] District Judge

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

MARCUS, Circuit Judge:

The central question presented on appeal is whether the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") bars the appellant, Instituto de Prevision Militar ("IPM"), from pursuing state law claims against Merrill Lynch & Co. and its affiliates for their role in a fraud committed on IPM by Pension Fund of America, L.C. ("PFA"), a non-party to this action. In a nutshell, PFA allegedly defrauded investors throughout Latin America -- including IPM -- by stealing their money rather than investing it. IPM claims that, under Florida law, Merrill Lynch is liable for PFA's fraud because it allowed PFA to hold itself out as Merrill Lynch's agent, and because it failed to stop PFA from misappropriating IPM's funds. After granting IPM's request to consolidate this case with two related cases for discovery purposes, the district court granted Merrill Lynch's motion to dismiss, concluding that SLUSA precluded IPM's state law claims and that IPM failed to state a claim for fraud under the federal securities laws. After thorough review, we affirm.

I.

Because the district court decided this case on a motion to dismiss, we accept as true the facts contained in IPM's second amended complaint. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). The essential facts

2

are these. IPM "is a decentralized agency of the Republic of Guatemala, which administers social security for the Guatemalan Armed Forces." Second Amended Compl. ¶ 2. Under Guatemalan law, IPM holds legal title to the pension funds it administers and may sue and be sued in its own name.

In July 2001, Pension Fund of America began soliciting IPM's board of directors. With Merrill Lynch's permission, PFA used "Merrill Lynch's brochures, literature and company seal" to represent to IPM that it was "a business partner of Merrill Lynch." Id. ¶ 20. "Relying upon Merrill Lynch's reputation," id. ¶ 21, IPM agreed to invest in "retirement trust accounts" comprised of a life insurance component and a mutual fund component. IPM and PFA signed a trust agreement that provided for Merrill Lynch "to act as trustee of IPM's pension funds." Id. Pursuant to the agreement, IPM wired over $7.7 million to Merrill Lynch, which deposited those funds in an account "titled in the name of 'Pension Fund of America, LLC[.]'" Id. ¶¶ 22, 25. Within two months, Merrill Lynch allowed PFA to transfer more than $3 million out of the account. According to the second amended complaint, PFA "was taking money from the IPM account for its own benefit and for its principals' personal use." Id. ¶ 34.

Meanwhile, Merrill Lynch was "actively promot[ing]" PFA and vouching for the character of PFA's principals. Id. ¶ 35. Specifically, on December 4, 2001,

3

Eduardo Coloma, a Merrill Lynch employee, wrote a letter touting PFA to Jennifer Lloyd, Corporate Services Administrator at Offshore Company Services Limited. Coloma informed Lloyd that he had been doing business with PFA principal Luis Cornide for one year and could recommend him "with complete confidence." Id. IPM alleges that "misleading recommendation letters" such as this one "were distributed to IPM to guarantee the safety of the funds entrusted to Merrill Lynch and maintain IPM's false sense of security in Pension Fund of America." Id. ¶ 36.

In January 2002, IPM arranged a meeting with PFA and Merrill Lynch because it was not receiving statements "on a regular basis." Id. ¶ 37. At the meeting on January 22, "Merrill Lynch ratified its relationship with [PFA] . . . , and IPM instructed Coloma, as Merrill Lynch's representative, that no transactions be authorized in the IPM Account without IPM's written consent." Id. Nevertheless, Merrill Lynch executed unauthorized transfers of $150,000 in September 2002 and of over $4 million in December 2002. "Unauthorized transfers of $1,080,000 and $17,804.65 followed." Id. ¶ 38. "In short, Merrill Lynch permitted Pension Fund of America to ransack IPM's pension funds account." Id. ¶ 41.

In November 2002, IPM sued PFA and its principals in Florida state court, alleging numerous state law claims. Pursuant to a court order in that proceeding, Merrill Lynch transferred nearly $4.9 million into a trust account for IPM. Out of

4

the approximately $7.7 million IPM had entrusted to PFA, more than $2.8 million remained unaccounted for.

It turns out that IPM was only one of many Latin American investors allegedly defrauded by PFA. On March 28, 2005, the Securities and Exchange Commission sued PFA in the United States District Court for the Southern District of Florida, alleging widespread fraud and theft of investors' money. In that proceeding -- which we will refer to as the "SEC Action" -- the district court froze PFA's assets and appointed a receiver for the company. One month later, several PFA investors filed a putative class action (the "Class Action") against PFA's principals and several other defendants, including Merrill Lynch, alleging that they helped PFA commit the fraud. Shortly thereafter, the district court in the SEC Action entered a case management order requiring all lawsuits against PFA's former "banks, brokerage houses, service providers or other third parties" to be filed as ancillary proceedings to the SEC Action. SEC v. Pension Fund of Am., L.C., No. 05-cv-20863 (S.D. Fla. June 22, 2005) (receivership case management order).

Abiding by the case management order, on October 14, 2005, IPM filed this lawsuit against Merrill Lynch & Co., its affiliates, and Coloma (collectively "Merrill Lynch"). IPM's verified amended ancillary complaint asserted seven state

5

law tort claims, including negligence, breach of fiduciary duty, and fraud. On November 1, 2005, IPM commenced a similar lawsuit against Lehman Brothers (the "Lehman Action") based on its role in the larger PFA fraud. Thus, by November 2005, there were four related actions pending in the Southern District of Florida: this case, the SEC Action, the Class Action, and the Lehman Action.

On December 19, 2005, Merrill Lynch moved to dismiss this case in its entirety, arguing, among other things, that SLUSA precluded all of IPM's claims. While the parties were briefing Merrill Lynch's motion to dismiss in this case, IPM moved to consolidate for discovery purposes the Class Action and the Lehman Action. Faced with that motion, the district court issued an order to show cause to IPM why this case should not also be consolidated with those two cases. IPM responded by expressly asking the district court to "permit consolidation of the discovery process in this case[.]" (Pl.'s Resp. to Order to Show Cause ¶ 4, Jan. 25, 2006.) The district court agreed with IPM, concluding that "it is in the best interests of all parties concerned, as well as in the interests of judicial economy, to consolidate [this case, the Class Action, and the Lehman Action] for purposes of discovery." (Consolidation Order at 3, Feb. 13, 2006.) Seven months after consolidating the cases, the district court granted Merrill Lynch's motion to dismiss, concluding that IPM's claims were precluded by SLUSA. The district

court noted, however, that IPM could "adequately plead claims under SLUSA" (Order at 7, Sept. 15, 2006), and, therefore, granted IPM leave to file a second amended complaint.

IPM's second amended complaint alleged essentially the same facts and state law theories as it had in its previous complaint, but added a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Merrill Lynch promptly moved to dismiss the second amended complaint, arguing that SLUSA precluded the state law claims, and that it failed to state a claim under § 10(b) and Rule 10b-5 as well. On September 28, 2007, the district dismissed IPM's second amended complaint in its entirety, reprising its conclusion that SLUSA barred the state law claims and holding that the federal securities fraud claim failed because the second amended complaint did not adequately plead scienter, reasonable reliance, and loss causation; most of the second amended complaint's allegations rested on the invalid theory of aiding-and-abetting liability; and the second amended complaint failed to plead the alleged misrepresentations with particularity.

This timely appeal ensued.

## II.

We review de novo both the district court's conclusion that SLUSA precludes IPM from bringing its state law claims, Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1336 (11th Cir. 2002), and the district court's determination that IPM failed to state a claim under § 10(b) and Rule 10b-5, Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006).

Congress enacted the Securities Litigation Uniform Standards Act to ensure that securities fraud class actions were brought under federal law and in federal court. The history of SLUSA began in 1995, when Congress became concerned that private securities fraud class actions were "injur[ing] the entire U.S. economy" by rewarding "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81 (2006) (quotation marks omitted). To curb these perceived abuses, Congress passed the Private Securities Litigation Reform Act of 1995 (PSLRA), which included a number of provisions that made life more difficult for plaintiffs litigating federal securities fraud claims in federal court, such as erecting a substantially heightened pleading standard for scienter and an automatic stay of discovery pending the resolution of a motion to dismiss. See id. at 81-82. Rather than risk tripping over the hurdles imposed by the PSLRA, plaintiffs and their

8

attorneys began bringing securities fraud class actions under state law, often in state court. See id. at 82. Congress then passed SLUSA "to stem this 'shif[t] from Federal to State courts' and 'prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of'" the PSLRA. Id. (quoting SLUSA §§ 2(2), (5), Pub. L. No. 105-353, 112 Stat. 3227 (1998)).

> The core provision of SLUSA provides:
>
> Class action limitations
> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). As the plain language of the statute makes clear, "SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims." Dabit, 547 U.S. at 87. Thus, SLUSA would preclude IPM's state law claims only if Merrill Lynch could establish that this case is (1) a "covered class action" that (2) is "based upon the statutory or common law of any State," and that (3) alleges a misrepresentation or omission or the use of a manipulative device "in connection with the purchase or

9

sale" of (4) a "covered security." 15 U.S.C. § 78bb(f)(1); see also Riley, 292 F.3d at 1341-42.   IPM concedes that the second element has been met because its claims are based on the statutory and common law of Florida, but argues that Merrill Lynch has satisfied none of the remaining three elements.  We are unpersuaded and, like the district court, conclude that, under its unambiguous terms, SLUSA applies here and precludes IPM's state law claims perfected as a "covered class action."

A.

We begin with whether this case qualifies as a "covered class action," which SLUSA defines as:

(i) any single lawsuit in which--

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which --

10

> > (I) damages are sought on behalf of more than 50 persons; and

> > (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

Section (i)(I) of the definition, 15 U.S.C. § 78bb(f)(5)(B)(i)(I), plainly does not apply here because IPM is suing on behalf of 1 person (itself), not "more than 50 persons." The second amended complaint says that IPM is a pension plan that owns legal title to the funds it administers and can sue and be sued in its own name. And SLUSA expressly states that "pension plan[s]," such as IPM, "shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action." Id. § 78bb(f)(5)(D). Merrill Lynch does not and cannot argue that IPM was "established for the purpose of participating in [this] action." It follows that IPM is seeking damages on behalf of only 1 person, not 50 as section (i)(I) of the definition of "covered class action" requires.

The question, then, boils down to whether this case satisfies either the requirements of section (i)(II) of the definition of "covered class action," 15 U.S.C. § 78bb(f)(5)(B)(i)(II), or the requirements of the "group of lawsuits" provision in section (ii) of the definition, 15 U.S.C. § 78bb(f)(5)(B)(ii). The district court believed that both of these provisions were met here. Because we conclude that

11

this case is part of a "group of lawsuits" covered by SLUSA, we have no occasion to address whether section (i)(II) is also satisfied.

The "group of lawsuits" provision found in the statute has four elements: (1) a "group of lawsuits filed in or pending in the same court"; (2) "common questions of law or fact"; (3) "damages are sought on behalf of more than 50 persons"; and (4) "the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii). This case, the Class Action, and the Lehman Action are a "group of lawsuits . . . pending in the same court," so the first element is easily met. In addition, the Class Action seeks damages on behalf of more than 3,400 class members, so the third element is satisfied as well. That leaves only elements (2) and (4).

Although IPM suggests that this case, the Class Action, and the Lehman Action do not raise "common questions of law or fact" as required by element (2), we remain unpersuaded. How PFA represented itself to IPM is a common issue of fact critical to all three cases. Moreover, whether these representations were "in connection with the purchase or sale" of a security is a common question of law. Indeed, IPM implicitly acknowledged the substantial overlap among the cases when it affirmatively requested that they be consolidated for discovery purposes. We think that is enough, particularly because, unlike the definition's single-lawsuit

12

provisions, the "group of lawsuits" provision in SLUSA's definition of "covered class action" does not require common issues of law and fact to "predominate." Compare 15 U.S.C. § 78bb(f)(5)(B)(ii) (defining "covered class action" as a "group of lawsuits" that involve "common questions of law or fact"); with id. § 78bb(f)(5)(B)(i) (defining "covered class action" as "any single lawsuit" that is filed on behalf of 50 or more persons or on a representative basis and that involves common questions of law or fact that "predominate over any questions affecting only individual persons or members") (emphasis added).

Similarly, the plain language of element (4) is easily satisfied. This case, the Class Action, and the Lehman Action undeniably were consolidated by the district court for discovery purposes. Thus, this "group of lawsuits" satisfies element (4)'s requirement that they be "consolidated . . . for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii) (emphasis added); see In re Worldcom, Inc. Sec. Litig., 308 F. Supp. 2d 236, 246 (S.D.N.Y. 2004) (concluding that cases consolidated for pretrial purposes qualified as a "group of lawsuits" under 15 U.S.C. § 78bb(f)(5)(B)(ii)); Gordon Partners v. Blumenthal, No. 02-Civ-7377, 2007 WL 431864, at *18 (S.D.N.Y. Feb. 9, 2007) (same); In re Fed. Nat'l Mortgage Ass'n Sec. Derivative & "ERISA" Litig., 503 F. Supp. 2d 25, 33 (D.D.C. 2007) (concluding that two lawsuits brought by plaintiffs who opted out of a class action were "covered class

13

actions" after they had been consolidated with the class action).

IPM suggests, however, that, notwithstanding the breadth of the clause, "consolidation . . . for any purpose" cannot be read to cover what happened here because the Congress that enacted SLUSA intended to preserve bona fide individual actions like this case. To be sure, IPM's theory of congressional intent draws some support from the overall structure of SLUSA -- which relies on limiting the use of the class action device rather than on outright preemption of state law -- and the Senate Banking Committee Report on the Act, which says that "[t]he Committee does not intend for the bill to prevent plaintiffs from bringing bona fide individual actions simply because more than fifty persons commence the actions in the same state court against a single defendant." S. Rep. 105-182 (1998), 1998 WL 226714, at *7. But in light of the provision's unambiguous language, we need not resort to inferences from the Act's overall structure or the results of a hunt through its legislative history.

Simply put, the plain meaning of "consolidation . . . for any purpose" includes consolidation for purposes of discovery only, and we cannot ignore that meaning. See, e.g., Sullivan v. Stroop, 496 U.S. 478, 482 (1990) ("If the statute is clear and unambiguous that is the end of the matter[.]") (quotation marks omitted). At the end of the day, what Congress did controls, not what a party thinks

14

Congress may have meant to do.

Rather than try to rearrange the deck chairs of its sinking ship in this appeal, IPM might have avoided this plain-language iceberg altogether if it had argued to the district court that consolidation was inappropriate because the joinder for discovery purposes would result in SLUSA preclusion. But IPM did not do that. Instead, after the district court asked why this case should not be consolidated with the Class Action and the Lehman Action, IPM expressly requested that the court consolidate all three cases for discovery purposes. IPM cannot now complain about the consequences of its own request, and, therefore, we have no occasion to address whether a consolidation over the plaintiff's objection that results in preclusion under SLUSA may amount to an abuse of discretion.

Merrill Lynch has established all four elements of the "group of lawsuits" provision found in the statute, 15 U.S.C. § 78bb(f)(5)(B)(ii). This case is a "covered class action" under SLUSA.

B.

We also hold that Merrill Lynch has established that IPM's claims are based on misrepresentations and omissions "in connection with the purchase or sale" of a security -- the third element of SLUSA preclusion. SLUSA contains the same "in connection with the purchase or sale" language that is found in § 10(b) of the

15

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  The Supreme Court has said repeatedly that the phrase "in connection with the purchase or sale" of a security in § 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes."  SEC v. Zandford, 535 U.S. 813, 819 (2002) (quotation marks omitted); accord Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971).  "It is enough that the scheme to defraud and the sale of securities coincide."  Zandford, 535 U.S. at 822.  But the Supreme Court has long recognized that so broad an interpretation of "in connection with the purchase or sale" of a security would create immense potential liability if private parties were granted the right to enforce § 10(b)'s full scope.  To deal with this problem, the Court has limited the judicially created private right of action under § 10(b) and Rule 10b-5 to plaintiffs who allege that a fraud induced them to purchase or sell a security.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).  Others, such as investors who held securities because of a misrepresentation or omission, have no private right of action under § 10(b) and Rule 10b-5.  Thus, there are frauds that both fall within the ambit of § 10(b) and Rule 10b-5 and still fail to support a private cause of action under those provisions, even though the SEC could bring an enforcement action on the same facts.

In Riley, a panel of this Court concluded that the scope of SLUSA's "in

16

connection with the purchase or sale" of a security requirement should follow the contours of the private right of action under § 10(b). Thus, the panel held that "under Blue Chip, SLUSA does not apply to claims dealing solely with the retention of securities, rather than with purchase or sale." 292 F.3d at 1345; see also Behlen v. Merrill Lynch, 311 F.3d 1087, 1093 (11th Cir. 2002) ("[I]n Riley, we looked to Blue Chip when we determined that Congress intended the phrase 'in connection with' to have the same meaning under the SLUSA that it has under section 10b-5 . . . .").

Riley, however, is no longer good law. Four years after we decided Riley, the Supreme Court squarely held in Dabit that by including the words "in connection with the purchase or sale" of a security in SLUSA, Congress meant to incorporate the actual meaning of those words, and not the limitations the Court had placed on the judicially created private right of action. See 547 U.S. at 89 ("For purposes of SLUSA pre-emption . . . the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities."). Thus, under Dabit, "in connection with the purchase or sale" of a security under SLUSA covers the same range of activities that the SEC could prosecute as violations of § 10(b) and Rule 10b-5. See Siepel v. Bank of Am., N.A., 526 F.3d 1122, 1127 (8th Cir. 2008). Put another way, "in connection with

17

the purchase or sale" of a security under SLUSA covers, at minimum, claims by purchasers, sellers, and holders of securities.

IPM nevertheless argues that its claims are not covered by this broad interpretation of "in connection with the purchase or sale" of a security because "[t]he gravamen of [the second amended complaint] is that Merrill Lynch and Coloma by their actions or inactions facilitated the theft of IPM's funds, which occurred post investment." Appellant's Br. at 46. In other words, IPM argues that Merrill Lynch aided and abetted PFA's theft, and that embezzlement of funds by an investment manager is not conduct "in connection with the purchase or sale" of a security under § 10(b) and Rule 10b-5. We remain unpersuaded.

The Supreme Court addressed a similar argument in Zandford. There, a broker convinced an elderly client to open an account and to grant the broker discretion to manage it. The broker used his power over the account to steal his client's money. On the specific facts of the case, the Court held that the SEC could state a claim in a civil enforcement proceeding under § 10(b) and Rule 10b-5:

> According to the complaint, respondent "engaged in a scheme to defraud" the Woods beginning in 1988, shortly after they opened their account, and that scheme continued throughout the 2-year period during which respondent made a series of transactions that enabled him to convert the proceeds of the sales of the Woods' securities to his own use. The securities sales and respondent's fraudulent practices were not independent events. This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal

18

the proceeds and did so. Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market. Rather, respondent's fraud coincided with the sales themselves.

535 U.S. at 820 (citation omitted). But in dicta, the Court cautioned that its "analysis does not transform every breach of fiduciary duty into a federal securities law violation. If, for example, a broker embezzles cash from a client's account . . . , then the fraud would not include the requisite connection to a purchase or sale of securities." Id. at 825 n.4.

We followed the Supreme Court's lead in Grippo v. Perazzo, 357 F.3d 1218 (11th Cir. 2004), which arose from a money manager's theft of his client's money. The client, however, could not prove that the manager ever used his money to buy any securities. Nevertheless, we held that the investor could state a claim for fraud under § 10(b) even though securities were never purchased on his behalf. It was sufficient that the manager "accepted and deposited [the investor's] monies as payment for securities" with no intent to deliver them. Id. at 1224; see also Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 597 (2001) (holding that the plaintiff alleged securities fraud where he claimed that the defendant sold him a security "while secretly intending from the very beginning not to honor" it).

The question here, then, is whether the second amended complaint alleges (1) fraud that induced IPM to invest with PFA (as in Grippo and Wharf) or a

19

fraudulent scheme that coincided and depended upon the purchase or sale of securities (as in Zandford), both of which would be "in connection with the purchase or sale" of securities under SLUSA; or instead (2) a simple embezzlement that does not coincide with a securities transaction, which, like the hypothetical discussed in Zandford, would not meet SLUSA's "in connection with the purchase or sale" of a security requirement.

After thoroughly reviewing the second amended complaint, we have little doubt that, like the plaintiff in Grippo, IPM is complaining about fraud that induced it to invest with PFA, which means that its claims are "in connection with the purchase or sale" of a security under SLUSA. Thus, for example, the second amended complaint emphasizes Merrill Lynch's failure to prevent PFA's use of its corporate name and logo, representations that IPM claims "lur[ed]" it to "invest its pension funds" with Merrill Lynch. Second Amended Compl. ¶ 20.

Moreover, throughout the second amended complaint's discussion of various state law causes of action, IPM repeatedly relies on the theory that Merrill Lynch was responsible for PFA's conduct because it allowed PFA to portray itself as Merrill Lynch's agent while soliciting IPM. The second amended complaint's negligence and breach of fiduciary duty claims, for instance, allege that Merrill Lynch "breached [its] duty of reasonable care to IPM by . . . knowingly or

20

recklessly allowing Pension Fund of America to represent that Merrill Lynch was the trustee bank for IPM's funds [and] knowingly or recklessly permitting Pension Fund of America to use Merrill Lynch's stamps and other materials on the account documents sent to IPM . . . ." Id. ¶¶ 56, 63. Likewise, IPM's negligent supervision claim alleges that PFA "was successfully marketed to IPM . . . through a series of fraudulent schemes and devices, including the use of Merrill Lynch's brochures, literature and company seal." Id. ¶ 73.

These allegations and others like them leave little doubt that one of the main building blocks of the second amended complaint is that Merrill Lynch failed to stop the fraudulent misrepresentations that induced IPM to invest with PFA. That is enough, we think, to conclude that this case is a "covered class action . . . alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of" a security. 15 U.S.C. § 78bb(f)(1).

To be sure, the second amended complaint also includes some allegations about Merrill Lynch's purportedly negligent handling of IPM's funds after the alleged misrepresentations occurred. But even assuming that, in theory, these allegations could support a state law claim that would not be precluded under SLUSA, the second amended complaint fails to articulate such a claim. To begin with, the Act says "[n]o covered class action . . . may be maintained" and defines

21

"covered class action" as a "single <u>lawsuit</u>" or "group of <u>lawsuits</u>." Although at least one court has gone as far as saying this language "suggest[s] that if any claims alleged in a covered class action are preempted, the entire action must be dismissed," <u>Rowinski v. Salomon Smith Barney, Inc.</u>, 398 F.3d 294, 305 (3d Cir. 2005), we need not go that far today. To resolve this case, it is enough to conclude that, even if SLUSA requires a court to assess preclusion claim-by-claim, the Act does not require district courts to act like a prospector panning for a few non-precluded theories amid a river of precluded ones. Rather, to avoid preclusion under SLUSA, a claim for relief should clearly state the ground on which it is based, and that ground cannot be one that is "in connection with the purchase or sale" of security under § 10(b) and SLUSA. If a single claim premises liability on multiple factual theories, then that claim would be precluded if at least <u>one</u> of those theories hinges on representations made "in connection with the purchase or sale" of a security.[1]

None of the counts in the second amended complaint passes this test. Although some of them rely in part on the charge that Merrill Lynch mishandled

---

[1] <u>Riley</u>, for example, took this approach. After holding (erroneously as it turns out) that SLUSA did not reach claims by "holders" of securities, as opposed to buyers and sellers, the <u>Riley</u> panel nevertheless concluded that the claims at issue were precluded because they rested on allegations that misrepresentations caused the plaintiffs to "<u>purchase and</u> retain" covered securities. 292 F.3d at 1345 (emphasis omitted in part). Because the allegations mixed precluded and non-precluded theories, <u>Riley</u> concluded that SLUSA pre-empted the plaintiff's claims.

IPM's funds, each count also expressly incorporates by reference or reiterates allegations that Merrill Lynch is liable for IPM's losses because it aided and abetted PFA's fraudulent misrepresentations. Accordingly, the "in connection with the purchase or sale" of a security element of SLUSA preclusion has been met here.

C.

Finally, Merrill Lynch must establish the last element of SLUSA preclusion -- that the alleged misrepresentations and omissions were "in connection with the purchase or sale" of a "covered security." The parties agree that mutual funds qualify as "covered securities" under SLUSA, but life insurance policies do not.[2] The "retirement trust accounts" PFA marketed to IPM were hybrid investments comprised of both a life insurance component and a mutual fund component.

---

[2] SLUSA says the phrase "covered security" means

> a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 [15 U.S.C.A. § 77r(b)], at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred, except that such term shall not include any debt security that is exempt from registration under the Securities Act of 1933 [15 U.S.C.A. § 77a, et seq.] pursuant to rules issued by the Commission under section 4(2) of that Act [15 U.S.C.A. § 77d(2)].

15 U.S.C. § 78bb(f)(5)(E). Under § 18(b) of the Securities Act of 1933, the phrase "covered security" includes "a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C. § 77r(b)(2). Because mutual funds are issued by investment companies registered under the 1940 Act, see United States v. NASD, 422 U.S. 694 (1975), they qualify as "covered securities" under SLUSA.

23

Based on binding precedent, hybrid securities like these are "covered securities."

In Herndon v. Equitable Variable Life Insurance Co., 325 F.3d 1252 (11th Cir. 2003) (per curiam), the plaintiff alleged fraud in connection with a variable life insurance policy, which contained both a variable annuity (a "covered security") and a life insurance policy (not a "covered security"). Because variable annuities are "covered securites," a panel of this Court held that the variable life insurance policy was a covered security as well:

> Equitable [was] required to and did register the respective plaintiffs' individual annuity accounts with the SEC pursuant to the Investment Company Act of 1940. The fact that a variable life insurance policy account adds a life insurance component to the investment does not negate the fact that the statutory requirements of SLUSA have been met with regard to the annuity component of the insurance policy. As such, a variable life insurance policy is a "covered security" under SLUSA.

Id. at 1254.

Herndon controls this case. Like in Herndon, the mutual fund component of the "retirement trust accounts" marketed to IPM are "covered securities" that had to be registered under the Investment Company Act of 1940. Thus, the "retirement trust account" also is a "covered security," even though it includes a life insurance component that does not qualify as a "covered security."

IPM tries to distinguish Herndon by suggesting that we evaluate the security at the time PFA made the fraudulent misrepresentations. At that time, IPM says,

24

the mutual fund component had not yet been purchased, and, thus, the retirement trust accounts were not yet "covered securities." This argument cannot be squared with Grippo. In that case, we held that misrepresentations were "in connection with the purchase . . . of a security" under § 10(b) even though no securities were purchased because the defendant "accepted and deposited [an investor's] monies as payment for securities." 357 F.3d at 1224. What controlled in Grippo was the product that was marketed to the investor, not what the defendant actually did with the investor's money. The same rule applies under SLUSA. Because PFA marketed "covered securities" to IPM, any misrepresentations and omissions PFA made were "in connection with the purchase or sale of a covered security."

In short, Merrill Lynch has established all four elements of SLUSA preclusion: (1) this case qualifies as a "covered class action"; (2) the second amended complaint asserts state law causes of action; and (3) the state law claims are based on misrepresentations or omissions "in connection with the purchase" of (4) a "covered security." Accordingly, we affirm the district court's order dismissing IPM's state law claims because SLUSA precluded them.

III.

The only remaining question is whether the second amended complaint adequately pleaded a federal securities fraud claim under § 10(b) and Rule 10b-5.

25

At the outset, we acknowledge that this argument is an awkward one for IPM because, as we explained in Section II, supra, it spent the bulk of its brief arguing that its allegations would not support a claim under § 10(b). The Federal Rules of Civil Procedure, however, allow plaintiffs to plead inconsistent theories, see Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency."), so we accept IPM's § 10(b) allegations as a good faith attempt to plead a valid claim. Nevertheless, IPM has abandoned any argument that the second amended complaint validly pleaded a § 10(b) claim.

A securities fraud claim brought under § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, contains six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). Under Fed. R. Civ. P. 9(b), allegations about the material misrepresentations or omissions "must state with particularity the circumstances constituting fraud." See also Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). Moreover, "[t]he § 10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor

must satisfy each of the elements or preconditions for liability . . . ." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 769 (2008).

According to IPM, the district court "based its [dismissal] of IPM's Section 10(b) and Rule 10b-5 claims almost exclusively on IPM's failure to plead the requisite scienter[.]" Appellant's Br. at 55 n.18 (emphasis added). But in fact, the district court spent sixteen pages describing five fatal flaws in the second amended complaint's § 10(b) claim: (1) it pleaded aiding-and-abetting liability as to Merrill Lynch, rather than primary liability; (2) it failed to plead the allegedly fraudulent statements with particularity; (3) it failed to plead scienter adequately; (4) it failed to plead reasonable reliance; and (5) it failed to plead loss causation. IPM's brief contests only the district court's conclusion about scienter. Because it has failed to challenge the district court's holdings on the other four grounds, IPM has abandoned the argument that it has adequately pleaded a § 10(b) claim. See United States v. Campa, 529 F.3d 980, 989 (11th Cir. 2008) (arguments not made in a party's initial brief are abandoned); Adler v. Duval County School Bd., 112 F.3d 1475, 1480 (11th Cir. 1997) (claim is abandoned on appeal if the appellant offers no "grounds in [its] briefs for finding trial court error"). Accordingly, we affirm the district court's dismissal of IPM's federal securities fraud claim too.

IV.

27

In sum, we affirm the district court's order dismissing IPM's second amended complaint because IPM's state law claims are precluded by SLUSA, and because IPM failed to adequately plead a federal securities fraud claim.

**AFFIRMED.**