[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-11178
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 25, 2010
JOHN LEY
CLERK

D.C. Docket No. 06-80652-CV-KLR

SFM HOLDINGS, LTD.,

                                                        Plaintiff-Appellant,

versus

BANC OF AMERICA SECURITIES, LLC,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 25, 2010)

Before TJOFLAT and CARNES, Circuit Judges, and THRASH,* District Judge.

THRASH, District Judge:

_____

*Honorable Thomas W. Thrash, United States District Judge for the Northern District of
Georgia, sitting by designation.

SFM Holdings, Ltd. appeals the dismissal with prejudice of its complaint seeking damages for breach of fiduciary duty and constructive fraud. For the reasons set forth below, we affirm the judgment of the district court.

## I. Facts and Procedural History

Appellant SFM Holdings, Ltd. ("SFM") is one of 178 investors defrauded in one of the largest securities fraud cases in Florida history. The perpetrators, John Kim and Won Lee, operated as investment advisers using various entities, including Shoreland Trading. Dr. Salomon Melgen is the president and general partner of SFM. John Kim convinced Dr. Melgen to set up a brokerage account with Banc of America Securities, LLC. (Compl. ¶ 14).[1] Dr. Melgen never had any direct contact with Banc of America Securities or its employees. When the account was set up, Dr. Melgen ceded a "limited" power of attorney to trade securities in the Banc of America Securities prime brokerage account. (Id. ¶¶ 14-17). Two of the documents completed to open the account were the Prime Broker Margin Account Agreement ("PB Agreement") and the Institutional Account Agreement ("IA Agreement"). The PB Agreement clearly and plainly stated that Banc of

---

[1]Because the district court decided this case on a motion to dismiss, we accept the allegations pled in the complaint as true. Instituto De Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1342 (11th Cir. 2008).

America Securities – referred to in the agreement as BofA – was not an adviser or fiduciary.

> Customer acknowledges that none of the BofA Entities or their respective agents or affiliates is acting as a fiduciary for or an adviser to Customer in respect of this Agreement or any transaction it may undertake with the BofA Entities; Customer understands that the BofA Entities are not acting as investment advisers or soliciting orders, that the BofA Entities are not advising it, performing any analysis, or making any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential, or suitability of any particular invest[ment].

(Appellee's Br., Ex. A, ¶ 11(b)). The IA Agreement established Banc of America Securities as SFM's "agent for the purposes of buying and selling securities." (Appellee's Br., Ex. B, ¶ 3).

On September 28, 2004, SFM put $10 million into the account with Banc of America Securities. Soon thereafter another $2.3 million was put into the account. (Compl. ¶ 22). Within a month, SFM was losing money in the account, and Dr. Melgen told John Kim that he wanted to close the account. (Id. ¶ 23). In response, Kim convinced Dr. Melgen to leave his money in the account in exchange for a written guarantee of his principal by Kim and Shoreland Trading. (Id. ¶ 24). Won Lee was also a partner with Kim in Shoreland. The complaint alleges that Won Lee had been trading extensively in SFM's account. Shortly

3

thereafter, Lee attempted to make an illegal trade -- selling a large amount of stock short without arranging to borrow the stock first -- in the account. (Compl. ¶ 42). Upon discovering the illegal trade the next day, Banc of America Securities ordered Lee to cover the short sale. The next day, Kim or Lee repeated the illegal short sale. Banc of America Securities then ordered Lee to remove all of his accounts (including SFM's) from Banc of America Securities. (Compl. ¶ 45). Nevertheless, Banc of America Securities permitted Lee and Shoreland to trade in the account for more than four weeks. (Compl. ¶ 47). According to the complaint, Banc of America Securities never notified Dr. Melgen of any suspicious trading activity in the account. (Compl. ¶ 51).

On November 2, 2004, Banc of America Securities received a letter signed by Dr. Melgen directing it to transfer SFM's assets to Shoreland's account. Dr. Melgen now claims that letter was a forgery. On the same day, Won Lee wrote Banc of America Securities confirming that he would accept SFM's assets into Shoreland's account with Banc of America Securities. Within two weeks, Shoreland transferred the money to another company, Wedbush Morgan Securities, LLC. This account was in the name of Shoreland only. (Compl. ¶ 29). All of the money was then stolen or lost in disastrous trading.

SFM filed this action against Banc of America Securities, claiming damages due to violations of federal and state securities laws, breach of fiduciary duty, and constructive fraud.[2] On the Defendant's motion, the district court dismissed the claims with prejudice. SFM appeals the dismissal of the breach of fiduciary duty and constructive fraud claims.

## II. Jurisdiction and Standard of Review

We have jurisdiction over the appeals of final decisions of the district court pursuant to 28 U.S.C. § 1291. We exercise de novo review as to the district court's decision to grant a motion to dismiss. Cachia v. Islamorada, 542 F.3d 839, 841-42 (11th Cir. 2008). We review the district court's refusal to grant leave to amend for abuse of discretion, although we exercise de novo review as to the underlying legal conclusion that an amendment to the complaint would be futile. Harris v. Ivax Corp., 182 F.3d 799, 802 (11th Cir. 1999).

---

[2]SFM has filed suit in federal court to recover assets from Shoreland's Receivership Estate. That case is also before Judge Ryskamp. See SFM Holdings, Ltd. v. John Kim, Shoreland Trading, LLC, Won Lee, Yung Kim, and Guy Lewis, Esq. as Receiver for Shoreland Trading, LLC, Case No. 06-80801-RYSKAMP. Additionally, SFM filed a state court action against John Kim, Won Lee, Shoreland, and Banc of America Securities.

III.  <u>Discussion</u>

A.

First, SFM argues that the district court erred in converting the Defendant's Rule 12(b)(6) motion to dismiss into a motion for summary judgment without giving notice to the Plaintiff.  Reading the Order of the district court, it is clear that the court did not do that.  The district court did, however, consider and rely upon the PB Agreement in granting the Defendant's motion to dismiss.  According to SFM, consideration of the document converted the Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, which would have required notice of the conversion to the parties.  SFM claims it was prejudiced by the lack of notice and the lack of opportunity for discovery.

The Defendant argues that the district court's consideration of the PB Agreement was proper because the document was incorporated by reference into the complaint and the document was central to the Plaintiff's claim.  In general, if it considers materials outside of the complaint, a district court must convert the motion to dismiss into a summary judgment motion.  <u>See</u> Fed. R. Civ. P. 12(b).  There is an exception, however, to this general rule.  In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.  <u>Day v. Taylor</u>, 400

F.3d 1272, 1276 (11th Cir. 2005); see also Maxcess, Inc. v. Lucent Technologies, Inc., 433 F.3d 1337, 1340 (11th Cir. 2005) ("a document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity."). SFM does not dispute the authenticity of the PB Agreement. It does argue that the document was not incorporated by reference into the complaint and that, even if it was, the document was not central to its claims.

Although the PB Agreement was not attached to the complaint, the complaint noted that the brokerage account was opened by "documents provided to John Kim and Won Lee by Banc of America Securities." (Compl. ¶ 18). These documents were repeatedly described as "account opening documents." (Id.) SFM does not deny that the PB Agreement is one of the account opening documents mentioned in the complaint. The Defendant argues that the agreement was the account opening document that established Banc of America Securities as a prime broker for SFM and absolved Banc of America Securities from any fiduciary duty as to the account. According to SFM, another document, the IA Agreement, established Banc of America Securities as its executing broker. Under SFM's theory, Banc of America Securities's role as an executing broker imposes upon it a fiduciary duty. However, there is no doubt that the PB Agreement

7

determined the terms of the relationship between SFM and Banc of America Securities. The agreement set forth the "terms and conditions" on which Banc of America Securities will "open and maintain accounts for and otherwise transact business with the customer.... " (Appellee's Br., Ex. A at 1). Further, to the extent that the terms of the PB Agreement conflicted with another agreement, it stated that it controlled over any other agreements between Banc of America Securities and its customer. (Appellee's Br., Ex. A ¶ 20). We have previously held that such relationship-forming contracts are central to a plaintiff's claim. Maxcess, 433 F.3d at 1340 n.3. The district court did not err in considering the PB Agreement in ruling on the motion to dismiss.

In its briefing on appeal, SFM relies on the other account opening document, the IA Agreement, to argue that Banc of America Securities had a fiduciary duty. Specifically, SFM argues that such a duty was established because the IA Agreement made Banc of America Securities its "agent for the purposes of buying and selling securities." (Appellee's Br., Ex. B, ¶ 3). The Defendant argues that SFM never relied on the IA Agreement to establish an agency in the district court proceedings, and that it cannot do so now. See, e.g., Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first

8

time in an appeal will not be considered by this court.") (citations omitted). In this case, SFM did not waive this argument. Rather, it made its agency argument relying on the PB Agreement, which the Defendant acknowledges "contained nearly identical language." (Appellee's Br. at 35, n.11). Further, the IA Agreement was already in the record, albeit for purposes of opposing the Defendant's motion to transfer venue. SFM put the IA agreement in the record before the district court, and it now asserts that the IA agreement is one of the account opening documents, which are central to its claim. Also, as we have already explained, the PB Agreement sets the terms of the parties' relationship, even when considered alongside of the IA agreement. For these narrow reasons, and for the sake of completeness, we will consider that document on appeal along with the PB agreement as one of the account opening documents.

## B.

SFM argues that the dismissal of its claims was improper because it alleged that Banc of America Securities was an executing broker in addition to a prime broker. The Defendant does not deny that it may have been both. "Banc of America Securities was engaged as a prime and executing broker." (Appellee's Br. at 14). Traditionally, executing brokers (distinct from the prime broker) take, or execute, trades in direct communication with the customer. The prime broker's

9

role is usually ministerial -- it allows the customer to open an account with it, and allows the executing broker to make trades for the benefit of the customer in the prime broker's name. See Practicing Law Institute, The SEC Speaks in 2000: Materials Submitted by the Division of Investment Management, 1169 PLI/Corp 383, 642-43 (2000 Practicing Law Institute) ("The client or its fiduciary closes the short position by notifying [the prime broker] that it has placed a covering transaction. The client covers the transaction by purchasing securities through an executing broker who confirms the trade with [the prime broker, who] then clears and settles the transaction."). Banc of America Securities claims that "[o]ften, prime brokers execute transactions as well." (Appellee's Br. at 14). To clear up this confusion, Banc of America Securities argues that it was not an "introducing broker." An introducing broker is usually the one who advises the customer and exercises discretion over its prime brokerage account.

SFM does not specifically allege that Banc of America Securities acted as an introducing broker. SFM does argue, however, that the terms "prime broker" and "clearing broker" are interchangeable, both performing ministerial services for executing and introducing brokers, respectively. Generally, clearing brokers execute, clear, and settle trades for the introducing brokers who have direct relationships with the client. Stuart J. Kaswell & Daniele Marchesani, The ABCs

of Broker-Dealer Regulation 2007: Broker-Dealer Regulation -- An Overview, 1604 PLI/Corp 9, 12 (2007 Practicing Law Institute). Like prime brokers, clearing brokers ordinarily owe no fiduciary duty to the customers of introducing brokers. Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1296 n.12 (11th Cir. 2002).

SFM suggests that Banc of America Securities's characterization of its role reflects a fundamental misunderstanding of traditional prime brokerage arrangements.[3] To resolve this dispute over terminology, we examine a Securities and Exchange Commission No-Action Letter ("No-Action Letter") discussing the nature of the prime brokerage industry. See Prime Broker Committee Request, SEC No-Action Letter, 1994 WL 808441 (January 25, 1994). By its terms, the PB Agreement is subject to the No-Action Letter. (Appellee's Br., Ex. A, ¶ 2). As described in the No-Action Letter, the customer, prime broker, and executing broker are typically "distinct parties." (No-Action Letter at *1). Usually, "the executing broker takes the order from the customer, yet the prime broker typically issues the confirmation [of the order]." (Id. at *5). Nevertheless, the No-Action Letter does predict variations on this model. Some brokers may act "as executing

---

[3]It is worth noting that none of the precedents that the Plaintiff cites for the proposition that prime and executing brokers are synonymous with clearing and introducing brokers, respectively, mention prime brokers.

11

brokers who clear prime broker transactions." (Id. at *7). And, "the clearing firm of an introducing broker acting as an executing broker" must execute a prime brokerage contract listing the responsibilities of the parties. (Id. at *8). Moreover, the No-Action Letter contemplates a distinction between an executing broker and an introducing broker. (Id. at *8) ("In cases involving introducing broker-dealers who act as executing brokers, the executing broker must inform each broker-dealer clearing its transactions that it intends to act as an executing broker.").

These distinctions may have significance in the regulatory context that are absent here. Whether Banc of America Securities had a fiduciary duty to SFM is determined by the substantive agreement of the parties. It is not determined by labels placed on the relationship. Kim, Lee and Shoreland acted as SFM's investment advisor. Kim exercised discretionary control over the account according to the allegations of the complaint. The PB Agreement explicitly stated the Banc of America Securities was not acting as an adviser or fiduciary to the customer. It had no direct contact with SFM. Given this relationship, the fiduciary is the party who has direct contact with and provides investment advice to the customer. See McDaniel v. Bear Stearns & Co., 196 F. Supp. 2d 343, 353 (S.D.N.Y. 2002) (clearing firms only liable when they become "actively and directly involved in the introductory broker's actions" and not when performing

12

mere "routine clearing functions."). Even if Banc of America Securities actually served as the prime and executing broker, "[i]n no way, shape or form does the complaint plead that [Banc of America Securities] was making decisions regarding the accounts [but rather] simply executed the [SFM] transactions along with the other transactions sent to it by [Kim]." Dillon v. Militano, 731 F. Supp. 634, 636 (S.D.N.Y. 1990).

SFM argues that the IA Agreement created a fiduciary duty with this language: "Client appoints Banc of America Securities as its agent for the purposes of buying and selling securities in its Cash Account." (Appellee's Br., Ex. B, ¶ 3). As part of that agency, the agreement authorized Banc of America Securities to "act upon client's instructions or those of its attorney-in-fact." (Id.) Under SFM's theory, that agency created a fiduciary duty, even though the same provision in the agreement states that Banc of America Securities "shall incur no liability in acting upon any such instructions . . . provided such instructions reasonably appear genuine to Banc of America Securities." (Id.) The IA Agreement, standing alone, did not create a fiduciary duty of Banc of America Securities to SFM. See Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, 732 F.2d 859, 862 (11th Cir. 1984) (no liability where broker discharged its limited duty of executing stock orders). Any actions Banc of America Securities

13

performed at the behest of Kim were authorized by the IA Agreement. Further, even supposing that Won Lee forged a letter to transfer Dr. Melgen's funds into Shoreland's account (this is disputed), the agreement authorized Banc of America Securities to act upon any client instructions that "reasonably appear[ed] genuine." (Id.) Therefore, Banc of America Securities's actions were appropriate within the limited agency created by the IA Agreement. Significantly, the agreement provided that Banc of America Securities could accept "without any inquiry or investigation by Banc of America Securities ... any other instructions concerning said Account" from an introducing broker. (Appellee's Br., Ex. B, ¶ 27).

SFM argues that Shoreland was not an introducing broker in this relationship, but only a mere adviser. The argument must fail. First, Shoreland was registered as a broker-dealer with the Securities and Exchange Commission until its registration was revoked in 2007. Shoreland Trading, LLC, 24 S.E.C. Release No. 55688, 2007 WL 1285754 (May 1, 2007). Further, the IA Agreement defines an introducing broker as "another broker through whose courtesy Client's Account has been introduced." (Appellee's Br., Ex. B, ¶ 27). There is no dispute that Shoreland (acting through its representatives) set up the prime brokerage account. Shoreland was acting as an introducing broker for SFM. Finally, the complaint acknowledges that Lee controlled Shoreland Trading. (Compl. ¶ 12).

14

Paragraph 27 of the IA Agreement absolves Banc of America Securities of liability for the acts and omissions of the introducing broker's officers, employees, or agents. (Appellee's Br., Ex. B, ¶ 27). Banc of America Securities performed to the extent of the agency created in the IA Agreement. The complaint does not allege that Banc of America Securities failed to settle and clear all trades. SFM's breach of fiduciary duty and construction fraud claims were properly dismissed.

We also find that the district court did not abuse its discretion in dismissing the complaint with prejudice. In its briefing on appeal, SFM seeks leave to amend because the factual allegations could support a breach of contract claim. However, as discussed above, Banc of America Securities acted pursuant to the IA Agreement and the PB Agreement. Banc of America Securities's compliance with its obligations under those documents precludes liability for breach of contract. Therefore, the suggested amendment would be futile.

## IV. Conclusion

For the reasons set forth above, the judgment of the district court is AFFIRMED.

15

TJOFLAT, Circuit Judge, concurring specially:

I concur in the court's judgment. I write separately because I believe that the district court's judgment should be affirmed on a more limited basis than the one the court takes.

The central question in this appeal is whether SFM Holdings, Ltd ("SFM") has sufficiently pled that Banc of America Securities ("BAS") owed SFM the fiduciary duty to supervise those purporting to trade on its behalf. To me, the answer is no. The parties' contracts plainly preclude the argument that BAS owed SFM the fiduciary duty alleged. I write separately because I believe that there is no need to go beyond the contractual language and the allegations in the complaint to affirm the district court's judgment.

As the court correctly notes, the existence and scope of a fiduciary duty is determined by the relationship between parties. See generally, e.g., Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 536 (2d Cir. 1999) ("Simply put, the fiduciary obligation that arises between a broker and a customer . . . is limited to matters relevant to affairs entrusted to the broker.") (internal quotation and citation omitted); Ward v. Atl. Sec. Bank, 777 So. 2d 1144, 1147 (Fla. 3d Dist. Ct. App. 2001) (examining the "facts and circumstances" of the parties' relationship to determine the existence of a fiduciary duty). And where, as here, the relationship

16

is established by contract, the existence and scope of a fiduciary duty may be ascertained by examining the contractual terms. See Chipser v. Kohlmeyer & Co., 600 F.2d 1061, 1066–67 (5th Cir. 1979).[1]

The agreement between SFM and BAS demonstrates that BAS did not have the fiduciary duty alleged in the complaint. Therefore, there is no need to delve into a discussion about the general roles of prime, executing, introducing, and clearing brokers. Whatever fiduciary obligations they may typically take on in the abstract, BAS did not assume those alleged here.

The complaint alleges BAS owed SFM the fiduciary duty to supervise third parties trading and managing its account[2] in order to prevent Lee and Shoreland from making unauthorized trading decisions in the SFM account; to notify SFM that Lee and Shoreland had made trades it claims were made without its consent; to notify SFM that it deemed those managing the account "untrustworthy;" to notify SFM that it ordered Lee to remove all accounts he managed—including the SFM account—out of BAS; and to take due care to confirm the authenticity of the forged transfer letter before transferring assets from the SFM account.

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[2] It is undisputed that Kim, Lee, or Shoreland were directly responsible for the trading activity and asset transfer discussed in the complaint.

The parties' agreement[3] demonstrates that supervising for SFM third parties managing its account was not a fiduciary duty entrusted to BAS. Indeed, their agreement expressly provides that it was not.

The PB Agreement plainly states that BAS would not act as a fiduciary:

> [BAS] are not Advisors of Fiduciaries:
> . . . .
>> Customer acknowledges that none of the BofA Entities or their respective agents or affiliates is acting as a fiduciary for or an advisor to Customer in respect of this Agreement or any transaction it may undertake with BofA Entities; Customer understands that the BofA Entities are not acting as investment advisers or soliciting orders, that the BofA Entities are not advising it, performing any analysis, or making any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular invest.

(Appellee's Br., Ex. A, ¶ 11)

What is more, the PB Agreement anticipates that the customer may utilize third parties to trade in or manage the customer's account and makes clear that BAS would not supervise or pass judgment on such parties' actions for the

---

[3] I use the term agreement to refer collectively, unless otherwise indicated, to the agreements referred to in the complaint and attached to BAS's motion to dismiss and SFM's response to that motion, i.e., the Prime Broker Margin Account Agreement ("PB Agreement") and the Institutional Account Agreement ("IA Agreement"), respectively.

18

customer.  For example, the PB Agreement provides that SFM may utilize other brokers, known as executing brokers, to place orders, in which case BAS would act as SFM's prime broker.  (Id. ¶ 3.)  The PB Agreement also acknowledges that SFM may permit another type of third party (the "Advisor") to have discretionary management authority over the account.  (See, e.g., id. ¶¶ 3(d), 10(b).)

Under the PB Agreement, when third parties trade in or manage the account, they are acting on behalf of the customer and not as an agent of BAS. Additionally, as the PB Agreement explains, BAS will not supervise or otherwise provide advice to the customer regarding decisions made by these third parties. For executing brokers, the PB Agreement states:

> As between Customer and BAS, the Executing Broker will be acting as an agent of Customer for the purpose of carrying out Customer's instructions with respect to the purchase, sale and settlement of securities.  Customer understands that no order may be legally accepted by BAS as Prime Broker from an Executing Broker with whom BAS has not entered into a Prime Brokerage Agreement.

 (Id. ¶ 3(a).)[4]  The PB Agreement consistently maintains that a third party making decisions for a customer's account will not be supervised by BAS for the

[4]  SFM argues that BAS had the fiduciary duty alleged in the complaint because there is no Prime Brokerage Agreement in the record that BAS entered into with Kim, Lee, or Shoreland. This argument is without merit.  The PB Agreement provides that BAS will not be supervising any third parties—not only executing brokers— trading or managing an account on a customer's behalf.  The question of whether the third party is an executing broker or some other third-party advisor is accordingly irrelevant to the question of whether BAS had the alleged fiduciary duty to supervise.

customer.  It further provides that "[t]he BofA Entities shall not be held liable for any acts or omissions of an Executing Broker, subcustodian or other third party.  All transactions effected with an Executing Broker or other third party for Customer shall be for the account of Customer and the BofA Entities shall have no responsibility to Customer or such third party with respect thereto,"  (id. ¶ 10(b)), and BAS would "rely upon any authorized instructions . . . which [BAS] reasonably belive[s] to be genuine and transmitted by authorized persons." (Id. ¶ 10(f).)

There is nothing in the parties' agreement to suggest that BAS owed the fiduciary duty alleged in the complaint.[5]  Instead, as explained above, the agreement provides the opposite.  It states that BAS would not be acting as a fiduciary and would not supervise, for the customer, third parties making decisions for the customer's account.

No allegation in the complaint is sufficient to establish the alleged fiduciary duty in spite of the parties' agreement.  SFM has not alleged that BAS in fact took

_____

[5]  The IA Agreement language stating "Client appoints BAS as its agent for the purposes of buying and selling securities in its Cash Account" does not change this conclusion. (Appellee's Br., Ex. B, ¶ 3.)  First, it is not clear that this provision is even applicable because SFM's allegations relate to trades and transfers made in a Prime Broker Margin Account rather than a Cash Account.  But critically, SFM does not claim that BAS failed to buy or sell securities consistent with its instructions.   It claims that BAS should have prevented others purportedly trading on its behalf from making certain decisions.

20

on a supervisory role in handling its account. It has not alleged that BAS agreed to do anything more than what the agreement provided. Indeed, the opposite is true. The complaint states that BAS never spoke or had any interaction with SFM and Melgen. Nor does mere knowledge about Kim, Lee, and Shoreland's actions create a fiduciary duty where none otherwise existed. See McDaniel v. Bear Stearns & Co., Inc., 196 F. Supp. 2d 343, 352–53 (S.D.N.Y. 2002) (explaining that mere knowledge of fraud by an introducing broker does not create fiduciary obligations for a clearing broker).

Finally, the allegation that BAS was an "executing broker" is insufficient to create the fiduciary duty alleged. This term, as SFM uses it in the complaint, is meaningless. It does not tell us anything about BAS. It does not tell us that BAS had any additional responsibilities or performed any role not contemplated by the parties' agreement in connection with Kim, Lee, and Shoreland's activities. Critically, it does not tell us that BAS had a fiduciary obligation to supervise, for SFM, third parties managing the SFM account. The parties' disagreement over whether a "prime broker" or an "executing broker" is like an "introducing broker" or a "clearing broker" is a red herring. No fiduciary duty existed because SFM and BAS agreed that there would be none.