[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10563
_____

D.C. Docket No. 9:06-cv-80652-KLR

SFM HOLDINGS, LTD.
and SALOMON MELGEN,

                                                        Plaintiffs–Appellants,

versus

BANC OF AMERICA SECURITIES, LLC,

                                                        Defendant–Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 4, 2014)

Before PRYOR and JORDAN, Circuit Judges, and FRIEDMAN,[*] District Judge.

FRIEDMAN, District Judge:

    The district court enjoined Plaintiffs–Appellants SFM Holdings, Ltd. and

Salomon Melgen (collectively "SFM") from prosecuting an action in Florida state

_____
[*] Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting
by designation.

court against Defendant–Appellee Banc of America Securities, LLC ("BAS").  The district court considered the injunction necessary "to protect and effectuate" judgments that were issued in an earlier federal lawsuit brought by SFM against BAS, in which SFM's claims were dismissed.  See SFM Holdings, Ltd. v. Banc of America Sec., LLC, No. 88, 06-cv-80652-KLR (S.D. Fla. Jan. 17, 2013).  SFM appeals from the issuance of this injunction, arguing that it does not fall within the narrow "relitigation exception" to the Anti-Injunction Act, 28 U.S.C. § 2283.  We agree in large part, holding that SFM's state court action presents some legal claims that differ from those decided in the prior federal action.  With respect to other claims now advanced by SFM, however, we conclude that the district court had authority to enjoin their relitigation in state court.

## I.  BACKGROUND

This appeal concerns the effect of an earlier federal lawsuit on a pending state lawsuit, both arising from the same course of events between the parties.  The facts alleged in each case, however, tell the story somewhat differently; indeed, these factual differences are integral to resolution of this appeal.  We draw on the facts as alleged in SFM's most recent state court complaint, the "2012 State Complaint," an amended complaint filed in its state case, which was initiated in 2008.  References to the complaint from SFM's earlier federal lawsuit will employ the label "2006 Federal Complaint."

2

In September of 2004, Dr. Salomon Melgen, a Florida ophthalmologist, invested a total of $15,000,000 in an account at BAS and granted permission to a man named John Kim to trade securities in the account. 2012 State Complaint ¶¶ 1–2, 19. The investment was made through an entity, SFM Holdings, Ltd., controlled solely by Dr. Melgen. He made the decision to put his assets under Kim's management on the recommendation of a friend, Jerome Fisher, who told Dr. Melgen that Kim had been producing strong returns for him. Id. ¶ 12. To establish SFM's account at BAS, Dr. Melgen signed two contracts: a Prime Broker Margin Account Agreement ("PBA") and an Institutional Account Agreement ("IAA"). Id. ¶ 19. Melgen also signed a Trading Authorization form, through which he designated Kim as his agent with authority to trade in the account. Id.

Unbeknownst to Dr. Melgen, Fisher was in financial trouble and, more specifically, it is alleged that this trouble was attributable to John Kim, who was not the expert securities trader that Fisher had made him out to be. Id. ¶ 15. In fact, Fisher's account at BAS was incurring large losses on margin, due to the poor stewardship of Kim and his business partner, Won Lee. Because of the losses that Kim and Lee — through an entity called Shoreland Trading — were causing in Fisher's account, BAS had notified Lee that an infusion of new assets was needed to cover the margin calls. Id. ¶ 87. Fortunately for Kim, Lee, and Fisher, they found a source of fresh money to plug this gap: SFM.

3

Over a week-long period in late September and early October of 2004, SFM funded its BAS account with $12.3 million.  Id. ¶ 22.  Shortly thereafter, Dr. Melgen learned that his account had suffered some losses, and he informed Kim that he planned on closing the account.  Id. ¶¶ 29, 33.  Fisher and Kim then met with Melgen and persuaded him to keep the account open; as part of the inducement, Kim provided Melgen with a written guaranty of his principal.  Id. ¶¶ 33–34.  Kim also transferred an additional $2.7 million into SFM's account, money which belonged to Dr. Melgen and was being held by Kim as part of a separate investment.  See id. ¶ 22; Appellants' Brief at 4.

Just a few months later, in February 2005, Dr. Melgen learned that the entire $15 million held in the SFM account at BAS was gone.  2012 State Complaint ¶ 57.  The story of what happened to Melgen's money will be discussed in further detail later in this opinion, as these facts pertain directly to whether SFM can permissibly be enjoined from litigating its action in state court.  For now, however, we present a snapshot of the basic allegations set out in the 2012 State Complaint. SFM first alleges that a substantial portion of its assets, roughly $9 million, was converted to Fisher's benefit by Won Lee, who allocated SFM's assets to cover margin calls in Fisher's account, as well as by Lee's allocation of trading gains to Fisher and trading losses to SFM.  Id. ¶¶ 26–27, 76, 82.  Moreover, SFM alleges that Lee was not even authorized to trade in its account, yet BAS permitted him to

4

do so. Id. ¶¶ 24–25. Second, SFM alleges that the remainder of its funds was transferred out of its account and into a separate Shoreland Trading account at BAS, from which Lee eventually stole SFM's assets. Id. ¶¶ 41, 45. The transfer was executed by BAS, which relied on directions contained in a letter transmitted to it by facsimile; the letter purported to be written and signed by Dr. Melgen, but in fact was a forgery produced and sent by Won Lee. Id. ¶¶ 41–42, 131(c).

In March 2005, shortly after Melgen learned of the loss of his assets, SFM filed an action in Florida state court against Kim, Lee, Shoreland Trading, and the KL Group, another entity controlled by John Kim and Won Lee. Appellants' Brief at 5. At that time, no wrongdoing was alleged against BAS, but SFM sought discovery from BAS requesting the production of records relating to all accounts controlled by Shoreland. The parties bitterly dispute the subsequent course of events; SFM contends that BAS wrongfully refused to produce relevant documents, and that BAS was even sanctioned by the state court for its recalcitrance. Id. at 5–7. BAS maintains that it complied with all court orders, and, to the extent that it did not produce documents sought by SFM, it argues that its behavior was compelled by Florida law protecting its clients' privacy. Appellee's Brief at 14. In any event, SFM's state lawsuit was eventually dismissed pursuant to a receivership order entered by the federal district court, emanating

5

from an action brought by the Securities and Exchange Commission against the KL Group.  Appellants' Brief at 7 n.5.

In June 2006, SFM filed a lawsuit against BAS in federal court.  In its complaint — the 2006 Federal Complaint — SFM brought four claims: two for violations of federal and Florida securities law, as well as tort claims for breach of fiduciary duty and constructive fraud.  The case was assigned to the same district court judge who was overseeing the receivership, and he ultimately dismissed SFM's complaint with prejudice.  SFM Holdings, Ltd. v. Banc of America Sec., LLC, No. 06-cv-80652-KLR, 2007 WL 7124464 (S.D. Fla. Feb. 12, 2007).  In its decision, the district court concluded that SFM had failed to state claims under either federal or state securities law, and it denied SFM leave to replead those claims.  Id. at *7.  The court also held that SFM's claims for breach of fiduciary duty and constructive fraud were deficient, stating that "[c]entral to both claims is the allegation that Banc of America was acting as SFM's fiduciary," but concluding that this requirement could not be satisfied, "[g]iven the plain language in the Prime Brokerage Agreement."  Id.  The court said it had examined that agreement, which contained a clause that "state[d] unequivocally that Banc of America was not 'acting as a fiduciary,' and was not 'advising [SFM], performing any analysis, or . . . offer[ing] any opinion, judgment or other type of information

6

pertaining to the nature, value, potential or suitability of any particular invest[ment].'" Id. (quoting the PBA) (some alterations in original).

The court added that "[t]he tort claims are also barred by the application of the economic loss rule, which provides that parties to a contract can only seek tort damages if the alleged tortious conduct constitutes a tort distinct from the parties' contractual rights and obligations." Id. at *8. Finally, the court held that "[r]epleading will not enable SFM to surmount the hurdles of the economic loss rule or the language of the Prime Broker Agreement." Id. It therefore dismissed the complaint with prejudice. Id.

SFM appealed the dismissal of the constructive fraud and breach of fiduciary duty claims, but this court affirmed. See SFM Holdings, Ltd. v. Banc of America Sec., LLC, 600 F.3d 1334, reh'g en banc denied, 402 F. App'x 513 (11th Cir. 2010). In reaching our decision, we examined not only the PBA, but also the IAA, and concluded that these two contractual agreements foreclosed SFM's tort claims. Id. at 1339–40. We did not consider the district court's alternative holding that Florida's economic loss rule operated to bar these claims. See id. But our ruling did address SFM's argument — made only in its appellate briefing — that it should be granted leave to amend its complaint by adding a claim for breach of contract, on the ground that the factual allegations already in its complaint could support such a claim. Id. at 1340. In the final paragraph of our decision, we

7

denied such leave by concluding that "Banc of America Securities's compliance with its obligations under [the PBA and IAA] precludes liability for breach of contract. Therefore, the suggested amendment would be futile." Id.

Prior to oral argument before this court in that appeal, however, SFM had already filed a new lawsuit in state court. Its complaint there included claims for breach of contract with respect to both the PBA and the IAA, as well as for breach of the implied covenant of good faith and fair dealing in these agreements. Appellants' Brief at 10–11. SFM also named Jerome Fisher — the friend who had drawn Dr. Melgen into this mess — as a defendant in that action. BAS thereupon removed the case to federal court on the ground that Fisher had been fraudulently joined in order to destroy diversity; the federal district court accepted that argument. Id. at 11. Eventually, the district court dismissed the removed action on res judicata grounds. Id. SFM appealed, and this court, in a per curiam decision, held that removal had been improper and the district court therefore lacked subject matter jurisdiction over the case. SFM Holdings, Ltd. v. Fisher, 465 F. App'x 820, 821–22 (11th Cir. 2012). We vacated the district court's dismissal of the action and ordered that it be remanded to state court. Id. at 822. After the remand to state court, SFM amended its complaint to add a claim alleging civil conspiracy between BAS, Fisher, Kim, Lee, and Shoreland Trading. This complaint, the "2012 State

8

Complaint," is now the operative complaint in the state action.  Appellants' Brief at 15.

Finally, we arrive at the federal decision that is the source of this appeal. After SFM's case was remanded to state court and SFM had filed its amended complaint there, BAS went back to federal court to seek an injunction against SFM's pursuit of the state action against it.  BAS argued that the district court's 2007 judgment dismissing SFM's original federal case with prejudice, along with our 2010 affirmance of that dismissal — which included the denial of leave to add a claim for breach of contract — together deserved insulation from a potentially inconsistent state court judgment.  The district court agreed and granted the injunction.  See SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR (S.D. Fla. Jan. 17, 2013).  SFM now appeals, arguing that the federal injunction was inconsistent with this court's mandate that the lawsuit be remanded to the Florida court, and that the injunction was impermissible under the Anti-Injunction Act, 28 U.S.C. § 2283, which generally forbids federal courts from enjoining proceedings in state court.[1]

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291, as the district court's injunction was permanent rather than interlocutory.  "Whether a district court has

---

[1]  We reject SFM's "mandate rule" argument summarily.  There is absolutely no basis for finding that this court, in determining that the district court lacked subject matter jurisdiction over the removed state action, also "impliedly held" that SFM's state court action should not be enjoined.

the authority to enjoin a state court action under an exception to the Anti-Injunction Act is a question of law that we review *de novo*."  Estate of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc., 645 F.3d 1267, 1272 (11th Cir. 2011).  "If the court had such authority, whether the [i]njunction should have issued presents a mixed question of law and fact, which we review for abuse of discretion."  Burr & Forman v. Blair, 470 F.3d 1019, 1030 n.31 (11th Cir. 2006).

## III.  DISCUSSION

### A.  All Writs Act and the Relitigation Exception to the Anti-Injunction Act

The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  The statute codifies "the long recognized power of courts of equity to effectuate their decrees by injunctions or writs of assistance."  Burr & Forman, 470 F.3d at 1026 (quoting Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993)) (alteration and quotation marks omitted).  Although its express language refers only to writs issued "in aid of [courts'] jurisdictions," it is understood that the All Writs Act "also empowers federal courts to issue injunctions to protect or effectuate their judgments."  Id. (quoting Wesch, 6 F.3d at 1470).

The Anti-Injunction Act, however, "serves as a check on the broad authority recognized by the All Writs Act." Id. at 1027. The Anti-Injunction Act provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283.

The Anti-Injunction Act's "core message is one of respect for state courts," and it "broadly commands that those tribunals 'shall remain free from interference by federal courts.'" Smith v. Bayer Corp., 131 S. Ct. 2368, 2375 (2011) (quoting Atlantic Coast Line R. Co. v. Locomotive Engineers, 398 U.S. 281, 282 (1970)). The statute allows three exceptions to this general prohibition, but "those exceptions, though designed for important purposes, 'are narrow and are not [to] be enlarged by loose statutory construction.'" Id. (quoting Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146 (1988)) (internal quotation marks omitted) (alteration in original). The Supreme Court has long emphasized that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." Id. (quoting Atlantic Coast Line, 398 U.S. at 297).

The third of the Anti-Injunction Act's exceptions provides that a federal court may issue an injunction "to protect or effectuate its judgments." 28 U.S.C. § 2283. This provision "is designed to implement 'well-recognized concepts' of

claim and issue preclusion," and is commonly labeled the "relitigation exception." Smith, 131 S. Ct. at 2375 (quoting Chick Kam Choo, 486 U.S. at 147). The exception "authorizes an injunction to prevent state litigation of a claim or issue 'that previously was presented to and decided by the federal court.'" Id. (quoting Chick Kam Choo, 486 U.S. at 147). But because preclusion decisions are "usually the bailiwick of the *second* court . . . every benefit of the doubt goes toward the state court [and] an injunction can issue only if preclusion is clear beyond peradventure." Id. (citing Atlantic Coast Line, 398 U.S. at 287).

In Smith, the Supreme Court's most recent decision explicating the relitigation exception, the Court invalidated a district court's injunction "for two reasons." Id. at 2373. First, the state court action involved a legal issue that "was not identical to the one decided in the federal tribunal." Id. Second, the plaintiff in the state action had not been a party to the federal lawsuit in which the prior judgment was issued, nor did he fall within one of the "handful of discrete and limited exceptions" under which nonparty preclusion is permissible. Id. at 2379. Consequently, the Court held that the district court, in issuing its injunction, had "exceeded its authority" under the relitigation exception. Id. at 2373.

In this case, our inquiry is limited to the first of the two grounds on which the Court relied in Smith, namely whether SFM's state action presents the same

claims or issues that were previously decided in SFM's federal lawsuit.[2]  If so, then the district court possessed authority to enjoin their relitigation.  If not, then it lacked such authority and an injunction should not have issued.  In conducting this inquiry, we are mindful that the relitigation exception "permits a federal court to enjoin a state proceeding only in rare cases," id. at 2373, and that, under this provision, "close cases have easy answers: The federal court should not issue an injunction, and the state court should decide the preclusion question."  Id. at 2382.

The parties seem to disagree about the breadth of the relitigation exception. Appellant SFM argues that it is exceedingly narrow: for an injunction to issue, the claim or issue sought to be litigated in state court must previously have been *actually* litigated and decided in federal court.  Appellants' Brief at 25–29. Appellee BAS argues, at least at certain points in its brief, for a broader view — that an injunction may issue to prevent the litigation of claims that either were actually litigated and decided *or* those that "could have been" litigated, but were not.  Appellee's Brief at 40–42.  This broader view is consistent with traditional principles of claim preclusion (although not issue preclusion), see Taylor v. Sturgell, 553 U.S. 880, 892 (2008), but not with the relitigation exception to the Anti-Injunction Act.  Whether the principles of claim preclusion may "inform"

---

[2]  It is undisputed that SFM and Dr. Melgen can be bound by the prior federal judgments. Although Dr. Melgen was not himself a party to the federal action, the district court's injunction order correctly noted that "privity existed between SFM and Melgen," as "Melgen is the president and principal of SFM's general partner and took all of the relevant actions on behalf of SFM."  SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 11 n.3 (S.D. Fla. Jan. 17, 2013).

13

one's view of the relitigation exception, see Smith, 131 S. Ct. at 2376 n.7, the relitigation exception is narrower and only authorizes an injunction "to prevent state litigation of a claim or issue 'that previously was presented to and decided by the federal court.'" Id. at 2375 (quoting Chick Kam Choo, 486 U.S. at 147); see Chick Kam Choo, 486 U.S. at 148 ("[A]n essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court."). Indeed, as the district court noted in this case, "unlike pure res judicata, the relitigation exception should only be invoked to preclude subsequent litigation of matters that actually were decided by the federal court." SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 11 (S.D. Fla. Jan. 17, 2013). This is the basis on which we shall proceed.

## B.  Semtek and Principles of Preclusion Law

The Supreme Court in Smith and Chick Kam Choo, therefore, has set forth a unique legal standard to determine the permissibility of enjoining state court proceedings under the relitigation exception. Nevertheless, the parties expend a fair amount of effort debating whether our inquiry in this case should be governed by federal or, alternatively, Florida rules of preclusion. Compare Appellants' Brief at 37–46 (arguing for Florida law), with Appellee's Brief at 42–46 (arguing for federal law). Their dispute revolves around differing interpretations of the

14

Supreme Court's decision in <u>Semtek Int'l Inc. v. Lockheed Martin Corp.</u>, 531 U.S. 497 (2001), which addressed the preclusive effect of federal diversity judgments. Under <u>Semtek</u>, federal common law generally incorporates state law to determine the preclusive effect of a federal diversity judgment. <u>See</u> <u>id.</u>[3] "This federal reference to state law will not obtain," however, "in situations in which the state law is incompatible with federal interests." <u>Id.</u> at 509.

We conclude, as did the Supreme Court in <u>Smith</u>, that the case before us does not demand resolution of these concerns. <u>See</u> 131 S. Ct. at 2376 n.6 ("Neither party identifies any way in which federal and state principles of preclusion law differ in any relevant respect. Nor have we found any such divergence."). A comparison between Florida rules and federal rules governing claim and issue preclusion reveals that the relevant principles are largely identical. <u>Compare</u> <u>State v. McBride</u>, 848 So. 2d 287, 290 (Fla. 2003) (claim preclusion), <u>and</u> <u>id.</u> at 290–91 (issue preclusion), <u>with</u> <u>Lobo v. Celebrity Cruises, Inc.</u>, 704 F.3d 882, 892 (11th Cir. 2013) (claim preclusion), <u>and</u> <u>CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.</u>, 327 F.3d 1309, 1317 (11th Cir. 2003) (issue preclusion). Moreover, we may draw on the Supreme Court's own precedents under the relitigation exception for more specifically apposite guidance.

---

[3] In this context, the term "state law" is shorthand for the preclusive effect that a state court "would accord one of its own judgments." <u>See</u> <u>Semtek Int'l Inc.</u>, 531 U.S. at 508; <u>see also</u> <u>Taylor</u>, 553 U.S. at 891 & n.4 (contrasting the rules that apply, under federal common law, to determine the preclusive effect of judgments issued in federal question as opposed to diversity cases).

The one purported substantive difference between Florida and federal law that is highlighted by the parties is the existence, under Florida law, of equitable exceptions that militate against preclusion where the "ends of justice" or "manifest injustice" so require.  See Appellants' Brief at 41–46 (citing, *inter alia*, Universal Constr. Co. v. City of Fort Lauderdale, 68 So. 2d 366, 369 (Fla. 1953) (en banc)).[4] SFM argues that these principles come into play because BAS thwarted SFM's earlier attempts to obtain evidence pertinent to the parties' relationship and demonstrative of BAS's wrongdoing.  Consequently, SFM contends, its 2006 Federal Complaint was drafted without the benefit of complete information, a defect from which BAS should not now be able to profit.  We need not sort through a history of discovery that remains bitterly disputed between the parties. Under the narrow view of the relitigation exception — which asks whether the claims or issues presented to the state court are the same as those that were actually litigated and decided by a federal court — if there are indeed material differences between the factual allegations presented by the 2006 Federal Complaint and the 2012 State Complaint, the cases present non-identical questions of law that render a federal injunction impermissible.  The parties' ongoing disputes over what

---

[4]  SFM also contests the premise that such exceptions do not exist under federal preclusion law, as applied in this circuit.  See Appellants' Reply at 24–25 (citing Maldonado v. U.S. Attorney Gen., 664 F.3d 1369, 1375 (11th Cir. 2011)).

16

happened in discovery do not affect our narrow inquiry under the relitigation exception to the Anti-Injunction Act.

### C. SFM's Conspiracy Claim

In its 2012 State Complaint, SFM alleges that BAS engaged in a conspiracy with Fisher, Kim, Lee, and Shoreland Trading "to mislead Dr. Melgen, and conceal the truth from him concerning the fraud and conversion of SFM funds." 2012 State Complaint ¶ 85. The 2006 Federal Complaint did not allege the tort of conspiracy. Thus, SFM argues, the prior federal judgments could not have decided this claim, and therefore SFM cannot be enjoined from prosecuting its conspiracy claim in state court. Appellants' Brief at 34.

### 1. Economic Loss Rule No Bar

BAS contends that "SFM's conspiracy tort claim in its 2012 State Complaint is no different than the torts the District Court dismissed in the 2006 Federal Action," Appellee's Brief at 48, and highlights the district court's holding that Florida's economic loss rule foreclosed the viability of any tort claims arising out of the contractual relationship between the parties. See id. at 51–52. Indeed, this is the ground upon which the district court primarily relied in its injunction order. See SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 13–15 (S.D. Fla. Jan. 17, 2013). The economic loss rule, as the district court described it in its 2007 ruling, "provides that parties to a contract can only seek tort damages if the alleged

17

tortious conduct constitutes a tort distinct from the parties' contractual rights and obligations," and the court determined that SFM's tort claims were barred by that rule. SFM Holdings, Ltd., 2007 WL 7124464, at *8. In its injunction order, the district court concluded that "SFM's conspiracy claim in the 2012 State Complaint is no different than the torts that this Court dismissed in the 2006 Federal Action," and that SFM's conspiracy claim therefore "is barred by this Court's economic loss rule holding." SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 13–14 (S.D. Fla. Jan. 17, 2013).

In response, SFM argues that a recent decision of the Supreme Court of Florida — which limited application of the economic loss rule to products liability cases — constitutes an intervening change in law that renders preclusion on this ground impermissible. Appellants' Brief at 34–35 (discussing Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc., 110 So. 3d 399 (Fla. 2013)). BAS replies that changes in the law thwart preclusion only where there have been "momentous changes in important, fundamental constitutional rights," a situation that it contends has not obtained here. Appellee's Brief at 52 (quoting Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1504 (11th Cir. 1984)).

This court, in its 2010 opinion affirming the dismissal of SFM's complaint, did not address the district court's economic loss rule rationale. Instead, exercising de novo review of the dismissal order, we concluded that SFM failed to state

18

claims for breach of fiduciary duty or constructive fraud.  Our 2010 ruling was based on a close examination of the two contracts executed between SFM and BAS, which revealed that SFM's tort claims rested on purported duties that BAS did not owe to it.  See SFM Holdings, Ltd., 600 F.3d at 1338–40.  Accordingly, the district court's alternative rationale based on the economic loss rule is not a judgment in need of "protection or effectuation" under the relitigation exception.  See RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. o (1982) ("If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result . . . [and] the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination.").  We therefore put the economic loss rule issue aside and return to the core inquiry: whether SFM's 2012 state conspiracy claim presents a legal claim or issue that has already been decided by a federal court.

### 2.  Comparison of 2006 Tort Claims and 2012 Conspiracy Claim

Although it is plain that no conspiracy claim was alleged in the 2006 Federal Complaint, "an actionable conspiracy requires an actionable underlying tort or wrong."  Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997).  This is to say that conspiracy is not a freestanding tort, but, rather, "a cause of action for

19

civil conspiracy exists . . . only if 'the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person.'" Id. (quoting Blatt v. Green, Rose, Kahn & Piotrkowski, 456 So. 2d 949, 951 (Fla. Dist. Ct. App. 1984)). The question before the court is whether SFM now alleges that BAS engaged in a conspiracy to commit the same torts as were previously alleged in its 2006 Federal Complaint, or, instead, a different tort or torts. This question implicates the conduct of BAS as well as that of its alleged co-conspirators, and the nature of the role now alleged to have been played by BAS in causing SFM's damages. Its resolution requires examination of SFM's allegations in both its 2006 and 2012 complaints. We therefore turn now to a close study of these pleadings.

In its 2006 federal lawsuit, SFM brought claims against BAS for breach of fiduciary duty and constructive fraud. Under Florida law, these torts rest on the same foundation, as "[a] constructive fraud is deemed to exist where a duty under a confidential or fiduciary relationship has been abused." Rogers v. Mitzi, 584 So. 2d 1092, 1094 (Fla. Dist. Ct. App. 1991) (citing, *inter alia*, Douglas v. Ogle, 85 So. 243 (Fla. 1920)). SFM's tort claims rested on a threefold theory of wrongdoing. First, SFM alleged that BAS allowed Won Lee to control the SFM account and to include SFM's assets in an omnibus account held by Shoreland Trading, without Dr. Melgen's authorization. 2006 Federal Complaint ¶¶ 25, 39, 40, 46, 51(A),

20

51(B).  SFM further alleged that BAS knew that Lee was an untrustworthy person who had executed at least two illegal trades in SFM's account, which prompted BAS to order Lee to move his trading operations to another financial institution. Id. ¶¶ 41–45, 47, 51(A), 51(D), 51(G), 51(I).  Second, SFM maintained that BAS failed to inform Dr. Melgen of Lee's unauthorized and suspicious activities in the SFM account.  Id. ¶¶ 51–56, 74–75, 77, 80–81.  Third, SFM alleged that BAS acted recklessly in relying on a letter, purporting to be written and signed by Dr. Melgen, instructing BAS to transfer SFM's remaining assets into a separate account at BAS — controlled solely by Shoreland Trading — from which Lee later took them.  In fact, the letter was a forgery produced by Lee.  Id. ¶¶ 26–27, 48, 50, 55, 76, 78.

These three basic allegations — BAS's allowing Lee to control SFM's account, BAS's failure to disclose to Melgen crucial information about Lee's activities in the account, and BAS's transfer of SFM's assets in reliance on the forged letter — formed the bases for SFM's breach of fiduciary duty claim in its 2006 federal lawsuit.  Id. ¶¶ 51–56, ¶¶ 75–78.  SFM's constructive fraud claim rested on the second of these allegations, namely that BAS "conceal[ed] information" that it should have disclosed to Melgen, and that this concealment proximately caused SFM's damages.  Id. ¶¶ 80–81.  Those damages, according to the 2006 Federal Complaint, resulted entirely — or almost entirely — from the

21

forged-letter transfer. See id. ¶ 27 (stating that $15 million, the entirety of Melgen's investment at BAS, was transferred in reliance on Lee's forged letter). SFM did express some uncertainty in this regard, however, as elsewhere in its 2006 Federal Complaint it alluded to other losses that were incurred prior to the transfer as a result of "risky and speculative" trading, and "trades effected by unauthorized persons." Id. ¶¶ 38, 60, 77.

SFM's 2012 State Complaint contains a new narrative, wholly absent from its 2006 Federal Complaint, regarding how it suffered damages. Specifically, SFM's new complaint alleges that Lee converted — that is, intentionally took — a substantial portion of SFM's assets before the transfer by BAS occurred, by allocating funds from SFM's account to cover outstanding margin calls in Jerome Fisher's account, as well as by allocating trading losses to SFM and trading gains to Fisher. See 2012 State Complaint ¶¶ 26–27, 37, 79–80, 86–96; see also Appellants' Brief at 27–28. By this mechanism of allocation, SFM contends in its 2012 State Complaint that roughly $9 million of its investment at BAS was converted to Fisher's benefit. 2012 State Complaint ¶¶ 76, 82.[5] In its 2006 Federal Complaint, by contrast, SFM did not allege that its money was

---

[5] "For well over a century, Florida courts have generally defined conversion as a wrongful act which deprives an owner of property of its use." Joe Nagy Towing, Inc. v. Lawless, 101 So. 3d 868, 876–77 (Fla. Dist. Ct. App. 2012) (citing cases); see also RESTATEMENT (SECOND) OF TORTS § 222A (1965) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.").

22

intentionally taken from it in this manner.  Instead, as already noted, the complaint seemed to allege an imprecise mix of losses, or perhaps alternative theories, based partially on "risky" trading and predominantly on the eventual transfer executed by BAS at Lee's direction.  See 2006 Federal Complaint ¶¶ 27–30, 38, 49, 51(F). Thus, with respect to the $9 million that SFM now alleges was converted to Fisher's benefit by means of Lee's intentional allocation decisions, the two complaints describe different scenarios as to how a substantial portion of Dr. Melgen's money was taken from him.[6]  While BAS argues that "SFM's damages claims in both actions relate to the loss of its entire investment because of BAS's alleged mismanagement and concealment," Appellee's Brief at 31–32, this statement elides the difference in SFM's new narrative concerning precisely how those losses were caused.

SFM's 2012 State Complaint for the first time includes allegations drawing a connection between BAS's conduct — now described as affirmative, intentional conduct — and the allocation scheme by which $9 million of SFM's money was converted to Fisher's benefit.  The character of this connection, according to SFM, rested both on BAS's facilitation of these acts of conversion, as well as on its concealment from Dr. Melgen that his money was being misappropriated by Lee to

---

[6]  We note that the math in SFM's 2012 State Complaint does not quite add up — SFM alleges that $9 million was taken through allocations to Fisher's account, 2012 State Complaint ¶¶ 76, 82, while between $7 to $8 million was stolen by the transfer based on the forged letter. Id. ¶ 45. These two figures total $16 or $17 million, which is somewhat greater than the $15 million that SFM alleges was lost in total.

benefit Fisher. Count III of SFM's 2012 State Complaint, the conspiracy claim, therefore includes factual allegations aimed at supporting conspiracies both to commit conversion and to conceal this conversion from Dr. Melgen.

As to BAS's alleged participation in the conspiracy to convert, SFM contends that BAS did so by permitting allocations to occur with the knowledge that SFM's funds were being wrongfully siphoned from it, as well as, in some instances, by actively facilitating the execution of these allocations. To support this theory, SFM puts forth an amalgam of factual allegations that includes new facts — not alleged in its 2006 Federal Complaint — as well as some facts that did appear in its earlier complaint. Paragraphs 85 through 108 of the 2012 State Complaint set forth the bulk of the new allegations. SFM alleges, for example, that on the day prior to its deposit of $10 million at BAS, a BAS account executive named Brett Speer sent an e-mail to Won Lee asking how Lee planned to cover a margin call in Fisher's account amounting to more than $5 million. 2012 State Complaint ¶¶ 15, 86–87. According to SFM, "Lee responded that he had a new client who would be bringing $10,000,000 to BAS." Id. ¶ 88. The following day, Speer communicated with another BAS official and acknowledged receipt of SFM's funds, and discussed these funds as belonging to the Shoreland Trading omnibus account. Id. ¶ 89.

24

The complaint goes on to describe further interactions between BAS's Speer and Lee that, according to SFM, demonstrate that BAS knew Lee was intentionally allocating losses to SFM's account and profits to Fisher's account. Id. ¶¶ 90–96. SFM cites, for example, a subsequent e-mail exchange between Lee and Speer in which Lee directs Speer to allocate certain trades to SFM's account. Id. ¶ 90. Additional e-mails are cited as demonstrating Speer's concern over the margin calls in both the SFM and Fisher accounts. Id. ¶¶ 91–93. Drawing on these communications, SFM alleges that BAS had specific knowledge of Lee's attempts to disproportionately allocate funds between the two accounts. Id. ¶¶ 90, 95-96. Furthermore, SFM alleges that "in some cases BAS personnel assisted in making the allocations." Id. ¶ 96. SFM also asserts that BAS had a financial motive to actively assist in Lee's conversion of SFM's funds, as BAS presumably did not want to be left responsible for losses sustained on margin in Fisher's account. See id. ¶¶ 92, 96.

In addition to BAS's alleged complicity in a conspiracy to convert SFM's assets, SFM further alleges that BAS conspired "to mislead Dr. Melgen, and conceal the truth from him concerning the fraud and conversion of SFM funds." Id. ¶ 85. SFM supports this assertion by alleging, for example, that "BAS and Fisher knew that Kim, Lee, and Shoreland were frauds, but worked together with them and with each other to conceal that information so they could protect and

25

advance their own interests." Id.  More specifically, SFM alleges that "BAS actively concealed from SFM the transactions in the Shoreland Trading omnibus account, as well as the fact that profits had been allocated to Fisher." Id. ¶ 97.[7] SFM further contends that "both BAS and Fisher concealed Fisher's role in the scheme that caused Plaintiff's losses," id. ¶ 66, and that "BAS maintained secrecy concerning the wrongful actions of Kim, Lee, Shoreland Trading, and [itself] even after Dr. Melgen learned that he had lost his assets." Id. ¶ 97.

The new factual allegations appearing in SFM's 2012 State Complaint provide support for two tort claims against BAS — conspiracy to convert, and conspiracy to conceal — that are different in nature than its previously alleged fiduciary-duty based claims.  The key difference underlying both claims is that SFM now alleges that intentional acts of conversion were ongoing in its account — prior to the eventual transfer based on the forged letter — as to which BAS had knowledge, with which BAS assisted, and which BAS concealed from Dr. Melgen. Because these precise factual allegations have never been placed before any federal court, the state court now faces tort claims that are "not identical to the one[s]

---

[7] Our dissenting colleague acknowledges SFM's allegation in the 2012 State Complaint that BAS concealed "the fact that profits had been allocated to Fisher," 2012 State Complaint ¶ 97, but he states that the conspiracy count "does not allege that Banc of America Securities knew that these profits belonged to SFM." Partial Dissent at 48.  To the contrary, SFM expressly asserts that BAS had knowledge of Lee's misallocation of profits from SFM to Fisher.  2012 State Complaint ¶ 90 ("Attempts by Won Lee to allocate losses between the SFM and Fisher accounts, and BAS's knowledge of these attempts, can be seen [in an e-mail from Lee to Speer]."); id. ¶¶ 95-96 ("The scheme was furthered by allocating, and in some cases reallocating, trades to benefit Fisher.  BAS was well aware that these allocations were taking place . . . .").

26

decided in the federal tribunal." See Smith, 131 S. Ct. at 2373.  Consequently, the district court lacked authority to enjoin SFM's prosecution of Count III of its 2012 State Complaint.[8]

Both the district court and BAS have noted that SFM's 2006 complaint did contain allegations related to the inclusion of its assets in a Shoreland Trading omnibus account, through which Lee "was able to allocate trades among various accounts controlled by it."  2006 Federal Complaint ¶ 39.  The district court, in its injunction order, noted that one basis for SFM's original tort claims was Lee's alleged "commingling [of] SFM's funds with other accounts [and] allocating [of] trades between accounts."  SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 13 (S.D. Fla. Jan. 17, 2013).  And BAS argues that, "[i]n both actions, SFM alleged that BAS permitted Lee to commingle assets, bulk trade through Shoreland's account, and allocate trades between accounts.  SFM added only detail to these allegations in the 2012 State Complaint."  Appellee's Brief at 28; see also id. at 26–29, 49–50.  Our dissenting colleague agrees.  See Partial Dissent at 40–43, 46–49.

But in the 2006 Federal Complaint, SFM was not able to connect these allegations to a theory of harm resulting from Lee's intentional allocation of

---

[8] We acknowledge our dissenting colleague's concern that our reading of SFM's conspiracy count takes the "ordinary demands from a broker and calls them conversion."  Partial Dissent at 45.  But we hasten to emphasize that our analysis here is conducted under the relitigation exception to the Anti-Injunction Act; we express no view regarding whether the allegations in SFM's 2012 State Complaint actually would suffice to state viable claims under Florida law.

SFM's money to cover Fisher's margin calls and to absorb losing trades, or to BAS's active role in facilitating and concealing these alleged acts of conversion. The sole paragraph in the 2006 Federal Complaint referring to the inclusion of SFM's funds in an omnibus account identifies these facts merely as an example of BAS's negligently allowing unauthorized activity to occur in SFM's account, activity that BAS then failed to communicate to Dr. Melgen. See 2006 Federal Complaint ¶ 39. In our view, our dissenting colleague reads far too much into paragraph 39 of the 2006 Federal Complaint, which he regards as alleging that Lee was "misallocating gains and losses of customers, including SFM and Fisher." Partial Dissent at 42–43; see also id. at 46–47 (reading paragraph 39 as including allegations that BAS "failed to inform SFM that Lee was misallocating SFM's funds"). But paragraph 39 simply does not state that Lee intentionally "misallocated" SFM's funds through the omnibus account as a means of benefiting Fisher; nor does any other paragraph appearing in the 2006 Federal Complaint.

In addition, although SFM's 2006 Federal Complaint advanced tort claims of BAS's alleged breach of fiduciary duty and constructive fraud based on its failure to inform SFM — or, as SFM sometimes characterized it, BAS's concealment from SFM — of various matters, these earlier claims cannot justify enjoining SFM's pursuit of its claim that BAS conspired to conceal the conversion of SFM's assets. The two complaints accuse BAS of concealing different things.

28

In 2006, SFM alleged that BAS concealed the fact that it had allowed Won Lee to control SFM's account, as well as that Lee had engaged in illegal short trades and that BAS had responded by directing Lee to leave Banc of America. See 2006 Federal Complaint ¶¶ 51, 75, 80-81. By contrast, paragraph 85 of the 2012 State Complaint expressly asserts that BAS concealed acts of conversion. Our dissenting colleague believes that "the allegation about misallocations in the omnibus account of paragraph 39 of the 2006 complaint bars SFM from relitigating these more detailed claims about the concealment of misallocations as a result of the margin calls in the 2012 complaint." Partial Dissent at 49. But we reiterate that neither in paragraph 39 nor in any other part of the 2006 Federal Complaint did SFM include allegations concerning misallocations, or, as SFM also characterizes them, "disproportionate[]" allocations, see 2012 State Complaint ¶ 26, made by Lee to benefit Fisher at SFM's expense.

It is also true, as BAS points out, that several other factual allegations concerning BAS's conduct appear to be virtually identical in both complaints. See Appellee's Brief at 29–31. But this does not alter the conclusion that SFM has now brought different tort claims, based on new theories of liability alleging for the first time BAS's knowing and active participation in a scheme to allocate SFM's funds to cover Fisher's losses, as well as BAS's concealment of that scheme. That having been said, this court need not grapple with BAS's argument

29

that SFM could have, or should have, advanced this claim of conspiracy in the original federal lawsuit.  See id. at 26–29.  BAS will be free to make this argument to the state court in support of any eventual preclusion defense it raises.  We face a simpler inquiry: has a federal court actually ruled on the identical legal questions posed by SFM's conspiracy claim, as that claim is founded on the allegations in the 2012 State Complaint?  For the reasons described above, we answer no, and therefore conclude that the high bar of identity required by the relitigation exception has not been met.  Consequently, the district court lacked authority to enjoin SFM's prosecution of its conspiracy claim in state court.

### D.  SFM's Contract Claims

In addition to its conspiracy claim, SFM also brings four contract-based claims in its 2012 State Complaint.  With respect to each of the two contracts executed between SFM and BAS — the Prime Broker Margin Account Agreement (PBA) and the Institutional Account Agreement (IAA) — SFM alleges both breach of contract and breach of the implied covenant of good faith and fair dealing.  2012 State Complaint ¶¶ 117–38.  This court, in its 2010 decision, held that the factual allegations contained in the 2006 Federal Complaint were insufficient to support claims for breach of either contract, and accordingly we denied SFM leave to amend its complaint to add them.  SFM Holdings, Ltd., 600 F.3d at 1340.  In its injunction order, the district court therefore concluded that "[t]he only way SFM

30

could proceed with its contract-based claims in state court is if those claims are based on different allegations than those previously presented to the Eleventh Circuit." SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 15 (S.D. Fla. Jan. 17, 2013). The district court found, however, that the basic allegations in both actions were the same, and therefore our 2010 ruling precluded SFM's pursuit of contract claims in state court. Id. at 15–17.

### 1. Our 2010 Futility Ruling

Before delving into our own analysis, we must address a preliminary issue, namely SFM's argument that because it never previously had the opportunity to litigate its contract claims in the district court, this court's 2010 ruling, which held that it would have been futile to grant SFM leave to amend its complaint to add them, cannot now preclude its litigation of these claims in state court. Appellants' Brief at 29–34. SFM never sought leave to amend while the case was before the district court, but instead noted in its briefing before this court that, "[a]t the very least, the factual allegations of SFM's complaint will support an action against [BAS] for breach of contract," and therefore asked that, "at minimum, the dismissal with prejudice should be reversed, and the cause remanded with directions to grant SFM leave to amend its complaint." Brief of Appellant at 28, SFM Holdings, Ltd., 600 F.3d 1334 (No. 07-11178). We concluded, however, that SFM's proposed amendment would be futile because "Banc of America Securities

31

acted pursuant to the IA Agreement and the PB Agreement," and thus "Banc of America Securities's compliance with its obligations under those documents precludes liability for breach of contract."  SFM Holdings, Ltd., 600 F.3d at 1340.

A court's determination that a proposed amendment to a complaint would be futile operates as a judgment on the merits of the proposed claim.  This conclusion follows from the fact that "[w]hen a . . . court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail."  St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 822 (11th Cir. 1999); see also Burger King Corp. v. Weaver, 169 F.3d 1310, 1320 (11th Cir. 1999) ("This court has found that denial of leave to amend is justified by futility when the 'complaint as amended is still subject to dismissal.'" (quoting Halliburton & Assocs., Inc. v. Henderson, Few & Co., 774 F.2d 441, 444 (11th Cir. 1985))).  In other words, denial on grounds of futility is essentially a holding that the proposed amended complaint fails to state a claim upon which relief can be granted, and "the Supreme Court has clearly stated that '[t]he dismissal for failure to state a claim . . . is a judgment on the merits.'"  N.A.A.C.P. v. Hunt, 891 F.2d 1555, 1560 (11th Cir. 1990) (quoting Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 399 n.3 (1981)) (internal quotation marks omitted) (alteration in original).

SFM complains that it never offered a proposed amended complaint to the district court; but the substance of its proposed amendment was made clear in its appellate briefing.  See Brief of Appellant at 28, SFM Holdings, Ltd., 600 F.3d 1334 (No. 07-11178) (maintaining that "*the factual allegations of SFM's complaint will support an action against [BAS] for breach of contract*" (emphasis added)).  In effect, SFM sought to add a count for breach of contract to its original complaint, without changing any of the factual allegations within it.  Thus, this court in 2010 had before it everything we needed to determine whether SFM could state a viable claim for breach of contract.  Based on our review of the factual allegations then presented and the two contracts at issue, we concluded that it could not.

## 2.  Comparison of 2006 Contract Claims and 2012 Contract Claims

In any event, SFM's argument is inconsequential given that it now *has* placed a new complaint before this court — its 2012 State Complaint — which may allege new facts supporting breach of contract claims.  Under the relitigation exception we must take care to "assess[] the precise state of the record and what the earlier federal order *actually* said."  Chick Kam Choo, 486 U.S. at 148.  As just noted, the facts alleged in the 2006 Federal Complaint were insufficient to state a claim for breach of either the PBA or IAA.  But as explained in our discussion of SFM's conspiracy count, supra at 20–29, the 2012 State Complaint advances a theory of harm that was not presented in its earlier federal lawsuit: the conversion

33

of a portion of SFM's funds through Lee's allocation of them to cover Fisher's losses. In addition, SFM alleges that BAS participated in this conversion by knowingly permitting intentional misallocation to take place, as well as by facilitating these acts of allocation in at least some instances and by concealing that these activities were occurring, all with the presumed purpose of protecting BAS's own interests. Because this theory of liability was not presented to this court in SFM's 2006 federal action, our 2010 ruling could not have decided the viability of any contract claims based on it. Count VII of the 2012 State Complaint, claiming that BAS breached the PBA, is such a claim. It expressly states that one ground for the asserted breach of that contract rests on the allegation that "BAS allowed Lee . . . to disproportionately allocate assets between SFM's account and Fisher's account." 2012 State Complaint ¶ 131(a). This claim, therefore, was improperly enjoined; SFM must be permitted to pursue it upon remand to state court.

BAS, in its briefing, argues that this court's earlier holding — that "Banc of America Securities acted pursuant to the IA Agreement and the PB Agreement" — forecloses any further litigation of contract claims arising from this course of events. See SFM Holdings, Ltd., 600 F.3d at 1340. And it highlights several factual allegations that appear to be virtually identical, in all material respects, in both complaints. Appellee's Brief at 16–17, 28–32. But, again, the fact that much of the narrative remains the same cannot detract from the differences that exist

34

between the 2006 and 2012 complaints. The critical difference is that SFM now contends that it was harmed in a different manner than was previously alleged — with respect to a portion of its assets — and that BAS bore an active causal connection to this harm. These allegations were not before this court in 2010; thus, determining whether BAS's conduct, as newly alleged, breached the PBA requires resolution of a legal claim that is not identical to those already decided. See Smith, 131 S. Ct. at 2373; Chick Kam Choo, 486 U.S. at 148. Consequently, SFM cannot be enjoined from pursuing in state court its claim for breach of the PBA, based on the theory that BAS participated in a scheme to convert SFM's assets by the mechanism of allocation between accounts.

On the other hand, to the extent that SFM's claim for breach of the PBA in Count VII is based on its original theory of harm — Lee's submission of a forged letter on which BAS relied to transfer SFM's funds out of its account — it is foreclosed. See 2012 State Complaint ¶ 131(c). In our 2010 decision, we squarely faced this issue and concluded that BAS acted pursuant to the two contracts when it relied on the letter to execute the transfer. SFM Holdings, Ltd., 600 F.3d at 1340. In doing so, we cited a provision of the IAA establishing that BAS "shall incur no liability in acting upon [instructions of the client's attorney-in-fact] provided such instructions reasonably appear genuine to [BAS]." Id. (quoting the IAA ¶ 3). In addition, we noted that the IAA "provided that [BAS] could accept

35

'without any inquiry or investigation by [BAS] . . . any other instructions concerning said Account' from an introducing broker." Id. (quoting the IAA ¶ 27).

In its 2012 State Complaint, SFM adds a few specifics to its recounting of this transaction, including the facts that Lee transmitted the letter by facsimile, that Lee has since admitted to having electronically pasted Dr. Melgen's signature, and that the letter lacked letterhead and was neither witnessed nor notarized. 2012 State Complaint ¶¶ 41–42, 131(c). What it does not allege is that BAS knew that the letter was a forgery. The facts alleged therefore simply do not add up to present a new legal issue, a new claim, or a new theory of liability to be resolved by the state court. They are, in a word, immaterial, given the facts that were already before this court when we made our earlier determination. This issue is surely important to SFM because SFM maintains in its 2012 State Complaint that a substantial portion of its funds — between $7 and $8 million — were taken from it by this transfer. Id. ¶ 45. We hold, however, that SFM can permissibly be enjoined from pursuing its claim for breach of the PBA based on BAS's transfer of these funds at Lee's direction.

As for SFM's other contract claims — Count V (breach of IAA), Count VI (breach of implied covenant in IAA), and Count VIII (breach of implied covenant in PBA) — they do not purport to rest on the newly alleged narrative of misallocation. See id. ¶¶ 117–27, 133–38. Moreover, none incorporates by

36

reference some of the key paragraphs in the conspiracy count that purport to show BAS's active participation in the scheme.  See id. ¶¶ 117, 122, 128, 133 (incorporating by reference paragraphs 2–69, but not paragraphs 85–108).  Accordingly, the district court acted within its authority when it enjoined SFM's pursuit of these three claims, and it did not abuse its discretion in doing so.

## IV.  CONCLUSION

"[T]he [Anti-Injunction] Act's core message is one of respect for state courts."  Smith, 131 S. Ct. at 2375.  The Act's relitigation exception permits federal court injunctions "only in rare cases," id. at 2373, "to prevent state litigation of a claim or issue 'that previously was presented to and decided by the federal court.'"  Id. at 2375 (quoting Chick Kam Choo, 486 U.S. at 147).  In this context, "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed."  Id. (quoting Atlantic Coast Line, 398 U.S. at 297).  And "[i]f we err, all is not lost," as "[a] state court is as well qualified as a federal court to protect a litigant by the doctrines of res adjudicata and collateral estoppel."  S. Cal. Petroleum Corp. v. Harper, 273 F.2d 715, 719 (5th Cir. 1960).

In this case, SFM has placed a complaint before a Florida state court that advances some legal claims that were not previously decided in its federal lawsuit.  We therefore hold, as explained in finer detail throughout this opinion, that the

district court lacked authority under the Anti-Injunction Act to enjoin SFM's pursuit of its conspiracy claim (Count III) and one of its contract claims (Count VII), to the extent the latter claim is based on the newly alleged facts pertaining to BAS's participation in a scheme to convert SFM's assets by the mechanism of allocation between accounts.  As to these claims, therefore, the district court's injunction order is reversed.

With respect to certain of SFM's contract claims — Counts V, VI, and VIII, as well as Count VII insofar as it is based on the forged letter transaction — this court's 2010 ruling may permissibly stand as a bar to their relitigation in state court.  We therefore affirm the district court's injunction order with respect to Counts V, VI, and VIII.  As to Count VII, because we hold that this claim can proceed at least in part, we remand to the district court to determine whether to issue a more limited injunction with respect to it, or whether considerations of comity militate against constraining the state court's ability to consider the full breadth of allegations and arguments in its resolution of this claim.  See Chick Kam Choo, 486 U.S. at 151 ("Because the injunction actually entered by the District Court was broader than the limited injunction we find acceptable, we must reverse the judgment approving a broad injunction and remand for entry of a more narrowly tailored order.  Of course, the fact that an injunction *may* issue under the Anti-Injunction Act does not mean that it *must* issue." (citation omitted)).  Whether

a more narrowly tailored injunction should issue against SFM's prosecution of this claim, therefore, is a discretionary decision that we return to the district court.

**AFFIRMED IN PART, REVERSED IN PART and REMANDED.**

PRYOR, Circuit Judge, concurring in part and dissenting in part:

I concur in part and respectfully dissent in part. I concur with the majority's opinion that the Anti-Injunction Act bars relitigation of some counts brought against Banc of America Securities, but I would affirm the injunction against prosecuting the other counts too. I agree with the majority about the governing law; my partial disagreement concerns only the record. Central to my disagreement with the majority is whether SFM alleged that Banc of America Securities participated in a conspiracy of conversion in the 2012 complaint. The clear answer is no. The district court correctly ruled that the 2012 complaint rehashes in greater detail the 2006 complaint. The 2012 complaint presents no new allegations—only more facts—and is barred by the Anti-Injunction Act.

I divide my discussion in three parts. First, I explain that the conspiracy count alleges only a conspiracy to conceal information from SFM. Second, I explain that the alleged conspiracy to conceal is not materially different from the concealment alleged in the 2006 complaint. Third, I explain that the remaining count for breach of contract should also be enjoined.

### A. SFM Has Not Alleged that Banc of America Securities Was a Conspirator in the Conversion of its Funds.

The 2012 complaint alleges more facts about the same trades, but more facts do not excuse us from invoking the relitigation exception. Contrary to the majority's conclusion, the conspiracy count of the 2012 complaint defines the

scope of the conspiracy as one of fraudulent concealment, not of conversion: "FISHER conspired with Kim, Lee, Shoreland Trading, and [Banc of America Securities] *to mislead* DR. MELGEN, *and conceal the truth* from him concerning the fraud and conversion of SFM funds." 2012 State Complaint ¶ 85 (emphasis added). These allegations are no different from the allegations of constructive fraud in the 2006 complaint. *See* 2006 Federal Complaint ¶¶ 79–81. By way of comparison, that complaint stated, "By *concealing information* which BANC OF AMERICA SECURITIES, LLC had a duty to disclose, BANC OF AMERICA SECURITIES, LLC committed a constructive fraud proximately causing the loss of the value of the assets held in the account of SFM Holdings, Ltd. at BANC OF AMERICA SECURITIES, LLC." *Id.* at ¶ 80 (emphasis added).

The majority acknowledges that both complaints involve the tort of fraudulent concealment, but the majority takes it upon itself to amend the 2012 complaint to allege a tort that SFM never alleged against Banc of America Securities—conversion. The majority then uses its amendment to tie Banc of America Securities to the allegations of conversion levied against only Fisher in the 2012 complaint. And the majority improperly conflates the tort of conversion with a broker's demand that Lee cover the large margin calls in the SFM account.

The majority argues that the 2012 complaint contains a "new narrative" about how SFM lost its money. Majority Op. at 22–23. Hardly so. The 2012

41

complaint is a more detailed narrative about the conversion perpetuated by Kim and Lee's Ponzi scheme, which SFM has now learned benefited Jerome Fisher. In particular, the 2012 complaint is a more detailed narrative of paragraph 39 of the 2006 complaint. That paragraph alleged that, before Lee transferred SFM's assets to Shoreland Trading in November,

> BANC OF AMERICA SECURITIES, LLC was permitting the assets of SFM Holdings to be traded in an *omnibus account* owned by Shoreland Trading, LLC. By this means Shoreland Trading, LLC was able to *allocate trades among various accounts* controlled by it including the account of SFM Holdings, Ltd. SFM Holdings, Ltd. did not authorize Shoreland Trading to trade or manage its account and had no knowledge that trading was being done in an omnibus account owned by Shoreland Trading, LLC and *controlled by Won Lee*.

2006 Federal Complaint ¶ 39 (emphasis added).

The misallocations in the omnibus account detailed in the 2006 complaint are the same "commingled" trades discussed in the 2012 complaint. 2012 State Complaint ¶¶ 26, 89, 93–97. In particular, paragraph 97 of the 2012 complaint states that the commingling was occurring in "the omnibus account." *Id.* at ¶ 97. This misallocation or commingling of funds arose after Lee made "risky trades," which were margin trades that resulted in huge margin calls. *Compare* 2006 Federal Complaint ¶¶ 40–44, *with* 2012 State Complaint ¶¶ 28, 30–32, 66, 85–94. Shoreland Trading, with Lee at the helm, covered the margin calls by commingling the funds in the "omnibus account" referenced in both complaints and misallocating gains and losses of customers, including SFM and Fisher. *Compare*

2006 Federal Complaint ¶ 39, 42, 46, *with* 2012 State Complaint ¶¶ 24, 66, 89. SFM alleges that this commingling could not have occurred "without the assistance of [Banc of America Securities]," 2012 State Complaint ¶ 93, which parallels the 2006 allegation that Banc of America Securities "permitt[ed] the assets of SFM Holdings to be traded in an omnibus account," 2006 Federal Complaint ¶ 39. Our Court has already held that it was the duty of Lee, the introducing broker, to sort out the gains and losses within that omnibus account. *See SFM Holdings, Ltd. v. Banc of America Sec., LLC*, 600 F.3d 1334, 1340 (11th Cir. 2010). The only concern of Banc of America Securities was to ensure that the margin calls were met. *See id.* at 1338–40.

The majority would have us forget about paragraph 39 of the 2006 complaint. The majority insists that SFM alleged those facts "merely as an example" of the negligence of Banc of America Securities. Majority Op. at 28. But SFM reincorporated those allegations into both counts for breach of fiduciary duty and fraudulent concealment. We cannot now ignore paragraph 39 and allow SFM to relitigate those allegations because discovery unearthed more details about the omnibus account and Jerome Fisher. Contrary to the majority's assertion, *id*. at 28–29, the new allegations in the 2012 complaint that Fisher benefited from Lee's wrongdoing has no bearing on the nature of the allegedly tortious wrongdoing committed by Banc of America Securities.

43

Satisfied with its new narrative, the majority goes on to propose that Banc of America Securities "actively facilitat[ed]" the misallocation of gains and losses, but Banc of America Securities is not a conspirator in the conversion of SFM's funds because it demanded that Lee satisfy the margin calls. *Id*. at 24–25. The majority discusses only one instance of this so-called active facilitation—a conversation between a Banc of America Securities's employee and Lee about upcoming margin calls. The majority then announces that the complaint describes "further interactions . . . [that] demonstrate that [Banc of America Securities] knew Lee was intentionally allocating losses to SFM's account and profits to Fisher's account." *Id*. at 25. But where are these allegations?

We all agree that Lee made some bad trades that led to multimillion-dollar margin calls. And, as any brokerage would do, Banc of America Securities "demanded" Lee to cover the margin, which SFM alleged in both the 2006 and 2012 complaints. *Compare* 2006 Federal Complaint ¶ 42, *with* 2012 State Complaint ¶¶ 86–92. To cover the margin, Banc of America Securities required him to either add cash to customer accounts or to liquidate some of his holdings because it was clear that the equity in the account was insufficient collateral for the loan that Banc of America Securities agreed Lee could have. Specifically, paragraphs 87, 91, and 92 of the 2012 complaint allege that Banc of America Securities informed Lee that he had margin calls exceeding $5 million in some of

44

his customer's accounts and that Lee had to either "bring in money" or Banc of America Securities was going to sell shares in the omnibus account to cover the margin call. 2012 State Complaint ¶¶ 87, 91–92. I part ways with the majority when it takes these ordinary demands from a broker and calls them conversion, even though that allegation appears nowhere in the complaint.

Had SFM intended to peg Banc of America Securities with the tort of conversion, it would have realleged the allegations of conversion in the 2012 complaint against Banc of America Securities, but it did not. In particular, paragraphs 78 through 83 allege that Fisher, and only Fisher, was liable for converting the funds of SFM. If SFM intended to plead that Banc of America Securities was also liable as a co-conspirator in converting those funds, then SFM would have included Banc of America Securities in the count of conversion or realleged some of the paragraphs about Fisher's conversion in the count of conspiracy. But SFM did not include Banc of America Securities in the count of conversion. Nor did it reallege paragraphs from that count in the count of conspiracy.

The conspiracy alleged in the 2012 complaint is a conspiracy to conceal by its plain terms. 2012 State Complaint ¶¶ 85, 96–97. In the same manner that SFM alleged that Banc of America Securities fraudulently "conceal[ed] information" in the 2006 complaint, 2006 Federal Complaint ¶¶ 79–81, the conspiracy count of the

2012 complaint alleges that Banc of America Securities conspired "to mislead" and "conceal the truth," 2012 State Complaint ¶ 85, that Banc of America Securities "never informed SFM or DR. MELGEN of these illegalities [perpetrated by Lee]," *id.* at ¶ 96, that Banc of America Securities "maintained secrecy" and "actively concealed from SFM the transactions in the Shoreland Trading omnibus account," *id.* at ¶ 97, and that Banc of America Securities "was also concealing from Plaintiffs information concerning FISHER'S account statements," *id.* at ¶98. The conspiracy alleged in the 2012 complaint is one of fraudulent concealment, not conversion.

### B. The Nature of the Concealment Alleged in 2006 Is the Same as that Alleged in 2012.

The majority also erroneously concludes that the concealment alleged in 2006 was materially different from the concealment alleged in 2012. Majority Op. at 28–29. The majority says that SFM alleged in 2006 that Banc of America Securities concealed only that it allowed Lee to control the account, that Lee had engaged in illegal short trades, and that Banc of America Securities directed Lee to leave the brokerage. *Id*. The majority contrasts that concealment with the "concealed acts of conversion" in the 2012 complaint. *Id*. at 29.

A fairer comparison of the complaints is that both contain allegations that Banc of America Securities withheld two pieces of critical information concerning the SFM account. First, Banc of America Securities failed to inform SFM that

46

Shoreland Trading, led by Kim and Lee, traded SFM's funds in an omnibus account. *Compare* 2006 Federal Complaint ¶¶ 25, 39, 51, *with* 2012 State Complaint ¶¶ 66, 89, 97. Second, Banc of America Securities failed to inform SFM that Lee was misallocating SFM's funds before it transferred the remaining funds pursuant to the forged letter. *Compare* 2006 Federal Complaint ¶ 39, *with* 2012 State Complaint ¶¶ 26, 66, 97.

The majority downplays the nature of the concealment in the 2006 complaint. In addition to the concealment described by the majority, 2006 Federal Complaint ¶ 75, SFM also alleged that Banc of America Securities concealed that it permitted Lee to trade SFM's funds in an omnibus account. 2006 Federal Complaint ¶ 39. As a result, Shoreland Trading "was able to allocate trades among various accounts." *Id*. SFM further alleged that "Banc of America Securities, LLC well knew [that] the SFM Holdings account was not an account of Won Lee and neither he nor Shoreland Trading, LLC had any authority to act in that account." *Id.* at ¶ 46. And with that knowledge, Banc of America Securities "permitt[ed] an unauthorized person to make decisions concerning the account without the consent or knowledge of SFM Holdings, Ltd." *Id.* That concealment "proximately caus[ed] the loss of the value of the assets" in the SFM account. *Id.* at ¶ 80.

To distinguish the 2006 allegations from the 2012 allegations, the majority places undue emphasis on the word "conversion" in the 2012 complaint, but the

47

allegations of concealment in 2012 were the same as those in 2006. In both complaints, SFM alleged that Banc of America Securities concealed that Lee commingled funds from different customers. 2012 State Complaint ¶¶ 66, 89, 95, 97; *see also* 2006 Federal Complaint ¶ 39. As it alleged in 2006, SFM alleged in 2012 that Banc of America Securities "actively concealed from SFM the transactions in the Shoreland Trading omnibus account." 2012 State Complaint ¶ 97. But nowhere in the 2012 complaint will you find an allegation that Banc of America Securities knew that Lee was misallocating profits from SFM to cover Fisher's losses. According to the conspiracy count of the 2012 complaint, Banc of America Securities concealed "that profits had been allocated to FISHER," but that count does not allege that Banc of America Securities knew that these profits belonged to SFM. *Id.* at ¶ 97; *see also id.* at ¶ 90 (alleging Banc of America securities had "knowledge of [Lee's] attempts" to "allocate losses" between SFM's and Fisher's accounts, but not alleging that Banc of America Securities knew Lee allocated SFM's profits to Fisher). Only the second count in the 2012 complaint for conversion against Fisher, not Banc of America Securities, alleges that "FISHER received benefits from these improperly allocated trades, as funds from unauthorized trades and improper allocations that belonged to Plaintiffs were placed into his [Banc of America Securities] account." *Id.* at ¶ 80.

48

As I see it, the allegation about misallocations in the omnibus account of paragraph 39 of the 2006 complaint bars SFM from relitigating these more detailed claims about the concealment of misallocations as a result of the margin calls in the 2012 complaint. The conspiracy count of the 2012 complaint does not include an allegation that Banc of America Securities concealed that Lee allocated profits to Fisher that belonged to SFM. That count contains more details about the same theory of Lee's misallocations in response to the margin calls. The district court was correct to enjoin SFM's attempted relitigation of fraudulent concealment.

## C. The District Court Was Correct to Enjoin the Remaining Count for Breach of Contract.

I also reject the majority's conclusion that SFM may relitigate its claim that Banc of America Securities breached the Prime Brokerage Agreement. Majority Op. at 33–35. The majority surmises that "the 2012 State Complaint advances a theory of harm that was not presented in its earlier federal lawsuit" and, as a result, "SFM must be permitted to pursue [the breach-of-contract allegations] upon remand to state court." *Id*. at 33–34. But, as I have discussed, the more detailed facts in the 2012 Complaint do not allege a conspiracy of conversion; those facts allege only that Banc of America Securities conspired to conceal facts from SFM about the loss of its funds.

The majority contends that the breach-of-contract allegations in the 2012 complaint are predicated on a new theory of harm, *id*. at 33–34, but I cannot agree.

49

SFM alleged in 2012 that "[Banc of America Securities] allowed Lee to trade in the SFM Account and to commingle funds without any authorization, and to disproportionately allocate assets between SFM's account and FISHER's account." 2012 State Complaint ¶ 131(a). But SFM already alleged the same in 2006 by pleading that Banc of America Securities allowed Lee to place SFM's account in an omnibus account with other customers and, as a result, Shoreland Trading "allocate[d] trades among various accounts" in that omnibus account. 2006 Federal Complaint ¶ 39. For these reasons, I cannot agree that Count VII of the 2012 complaint contains a new claim for breach of contract.

Let's not confuse a presumption against preclusion with more details about the same conduct. The Supreme Court has instructed us that preclusion must be "clear beyond peradventure." *Smith v. Bayer Corp.*, ___ U.S. ___, ___, 131 S. Ct. 2368, 2376 (2011). That difficult standard has been satisfied in this appeal. For that reason, I would affirm.